946 So.2d 1032 (2006)
Beth LINN, et al., Petitioners,
v.
Basil D. FOSSUM, M.D., et al., Respondents.
No. SC05-134.
Supreme Court of Florida.
November 2, 2006.
Rehearing Denied January 11, 2007.
*1033 Major B. Harding, Martin B. Sipple and Jennifer M. Heckman of Ausley and McMullen, P.A., Tallahassee, FL, for Petitioners.
Mark Hicks and Richard A. Warren of Hicks and Kneale, P.A., Miami, FL, S. William Fuller, Jr. and William D. Horgan of Fuller, Johnson and Farrell, P.A., Tallahassee, FL, and J. Nixon Daniel of Beggs and Lane, Pensacola, FL, for Respondents.
PARIENTE, J.
We review the First District Court of Appeal's decision in Linn v. Fossum, 894 So.2d 974 (Fla. 1st DCA 2004), based on express and direct conflict with the Fourth District Court of Appeal's decision in Schwarz v. State, 695 So.2d 452 (Fla. 4th DCA 1997). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. The conflict issue is whether an expert can testify on direct examination that the expert relied on consultations with colleagues or other experts in forming his or her opinion. We hold that such testimony is inadmissible because it impermissibly permits the testifying experts to bolster their opinions and creates the danger that the testifying experts will serve as conduits for the opinions of others who are not subject to cross-examination. We emphasize that our opinion today in no way precludes experts from relying on facts or data that are not independently admissible in evidence "[i]f the facts or data are a type reasonably relied upon by experts in the subject." § 90.704, Fla. Stat. (2005). We quash Linn and approve Schwarz to the extent it is consistent with this opinion.

FACTS AND PROCEDURAL HISTORY
Beth Linn and her husband Anthony filed a medical malpractice action against *1034 Dr. Basil Fossum alleging that he was negligent for failing to diagnose an injury to Beth's ureter caused by Dr. Dennis Lewis during a diagnostic laparoscopy. The Linns alleged that Dr. Lewis cut Beth's ureter during the procedure, causing urine to leak into her abdomen.
One week after the laparoscopy, Beth complained of abdominal pain and nausea. She was admitted to Twin Cities Hospital in Niceville, Florida. During her hospital stay, a renal ultrasound and renal scan indicated a possibility that urine was leaking into Beth's abdomen. The ultrasound revealed "extensive fluid present above the bladder." The radiologists who reviewed these studies raised the possibility of a "cut ureter." Following these tests, Dr. Fossum performed a bilateral retrograde pyelogram. Dr. Fossum concluded that the results of the pyelogram were negative for a urine leak and performed no further tests to resolve the possible inconsistency between the initial radiology studies and the pyelogram. The damage to Beth's ureter was ultimately diagnosed after a CT scan performed at Emory University Hospital in Atlanta showed a large fluid collection in the lower abdomen and another bilateral retrograde pyelogram was performed.
Before trial, the Linns took the deposition of Dr. Dana Weaver-Osterholtz, the expert witness for the defense. Dr. Weaver-Osterholtz stated that based on her review of Beth's records she would have inserted two stents to drain the urinary system. However, Dr. Weaver-Osterholtz opined that Dr. Fossum's "watch and wait" approach complied with the prevailing professional standard of care. Dr. Weaver-Osterholtz stated that she reached this conclusion based on a brief conference with several other urologists whom she regarded as representative of the general urologic community. These urologists were not witnesses in the trial. Dr. Weaver-Osterholtz said that she had presented Beth's case to her fellow physicians as a hypothetical scenario in a "curbside consult," and they all agreed that Dr. Fossum had met the standard of care.
The Linns filed a motion to exclude the expert testimony of Dr. Weaver-Osterholtz that Dr. Fossum met the standard of care. They argued that her proposed testimony was a conduit for the inadmissible hearsay opinions of the other doctors and emphasized that her personal standard of care differed from that of the doctors she consulted. The trial court denied the motion.
During the jury trial, the Linns presented Dr. Carlos Santa Cruz, who testified that Dr. Fossum had breached the applicable standard of care. Dr. Weaver-Osterholtz testified as a defense witness to rebut Dr. Cruz's opinion. On direct examination, defense counsel elicited Dr. Weaver-Osterholtz's opinion regarding the appropriate standard of care:
Q At my request, have you reviewed some records in this case involving a patient by the name of Beth Linn?
A Yes. I've reviewed a lot of records.
Q And a lot of depositions?
A A lot of depositions.
Q Okay. And in that review, I had asked you to render some opinions regarding "standard of care"; did I not?
A Correct.
Q And in order to give those opinions about the "standard of care" in this particular case, what, if anything, did you do to try to determine the appropriate standard of care for this case as it applies to my client, Dr. Fossum?

[Plaintiffs' objection to "any hearsay and use of this witness as a conduit for hearsay from other physicians." Objection overruled.]
*1035 By Mr. Fuller:
Q Do you understand my question?
A Yes. What I did was I presented the case in a severalin a couple of different forums. One is to five private practice urologists, and they varied from having experience of three years to well, three years to 25 years of experience. And then I also presented it at the University of Missouri that has five staff and their experience varies from a couple of years to as many as 40 years.
Q And based upon that determination of what the appropriate standard of care is for this case, did you come to an opinion as to whether Dr. Fossum met the standard of care?

[Plaintiffs' renewed objection. Objection overruled.]
A Can you state the question again?
By Mr. Fuller:
Q Yes. Based on your determination of what the appropriate standard of care is for this case, do you have an opinion, within a reasonable medical probability, as to whether what Dr. Fossum did met that standard of care?
A Yes, I do, and he met the standard.

(Emphasis supplied.)
At the conclusion of the trial, the jury returned a verdict for Dr. Fossum. The Linns filed a posttrial motion for judgment notwithstanding the verdict or in the alternative for a new trial, arguing that the trial court erred in allowing Dr. Weaver-Osterholtz to provide expert testimony on the appropriate standard of care. The trial court denied the motion and entered judgment in favor of Dr. Fossum.
The Linns appealed the judgment and the First District affirmed, concluding that the trial court did not err in admitting the opinion testimony of Dr. Weaver-Osterholtz even though it was based in part on what she described as a "curbside consult." Linn, 894 So.2d at 978-79. In dissent, Judge Kahn asserted that the holding of the First District majority conflicted with several decisions by the other district courts of appeal, including the Fourth District's decision in Schwarz. Linn, 894 So.2d at 984 (Kahn, J., dissenting). In Schwarz, the forensic pathologist who performed an autopsy on the victim testified on direct examination that he consulted with several other pathologists in forming his opinion on the victim's cause of death. 695 So.2d at 454. The Fourth District concluded that this testimony impermissibly bolstered the expert's opinion. See id. at 455.

ANALYSIS
We first address whether conflict exists between Schwarz and this case. We disagree with the dissent's assertion that the Fourth District in Schwarz did not decide the same issue as the First District in this case. The Fourth District framed the issue as "whether experts can testify that they discussed the case with other experts in the same field in order to arrive at their opinion." Schwarz, 695 So.2d at 454. The Fourth District's conclusion that this testimony "improperly permits one expert to become a conduit for the opinion of another expert who is not subject to cross-examination," Schwarz, 695 So.2d at 455, was the precise argument raised on appeal in this case by the Linns. See Linn, 894 So.2d at 977-78 (stating that the Linns "contend that Dr. Weaver-Osterholtz was merely a conduit for the hearsay statements made by the other doctors and that they were deprived of an opportunity to cross-examine any of these doctors"). We agree with Judge Kahn's conclusion in dissent that
[t]he conflict with Schwarz is . . . inescapable. The Schwarz court adopted a *1036 rule that prohibits an expert from bolstering or corroborating her opinions with the opinions of other experts who do not testify because such testimony, as in the present case, "improperly permits one expert to become a conduit for the opinion of another expert who is not subject to cross-examination." 695 So.2d at 455.
Linn, 894 So.2d at 984 (Kahn, J., dissenting).[1]
We now turn to the resolution of the conflict issue, which is whether experts can testify on direct examination that they relied on the hearsay opinions of other experts in forming their opinions. Because we must decide as a matter of law whether the rules of evidence allow an expert to testify on direct examination that he or she consulted with other experts, we apply a de novo standard of review.
Expert testimony is governed by sections 90.702-90.706, Florida Statutes (2005). Section 90.702 provides that experts may testify in the form of an opinion "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue." The expert's testimony "is not objectionable because it includes [an opinion on] an ultimate issue to be decided by the trier of fact." § 90.703, Fla. Stat. (2005). In other words, the evidence code permits an expert to give an opinion on any disputed issue if the expert has specialized knowledge that will assist the trier of fact in resolving that issue.
Unlike lay witnesses, experts can rely on "facts or data" not admissible in evidence in forming their opinions. § 90.704, Fla. Stat. (2005). However, there are important limits to this general rule. First, the facts or data must be "of a type reasonably relied upon by experts in the subject to support the opinion expressed." § 90.704. Second, an expert cannot bolster his or her testimony by testifying that a particular treatise supports an opinion. See Liberatore v. Kaufman, 835 So.2d 404, 407 (Fla. 4th DCA 2003), and the cases cited therein. But literature that the expert or trial court recognizes as authoritative can be used in cross-examination. See § 90.706, Fla. Stat.[2]
Section 90.704, which was modeled after Federal Rule of Evidence 703,[3] significantly *1037 expanded the facts or data on which experts could rely in forming their opinions on an issue for trial. Before the adoption of section 90.704, with limited exceptions, an expert's opinion was admissible at trial only if it was based on the facts in evidence or on facts personally known by the expert. See Cirack v. State, 201 So.2d 706, 709 (Fla.1967) ("The rules relating to opinion evidence likewise require that the opinion of an expert be based on facts in evidence, or within his knowledge.").
Initially, we note that by its plain terms section 90.704 is restricted to "facts or data reasonably relied on" by experts. Opinions of other experts who have no first-hand knowledge of the case that are solicited by the testifying expert constitute neither "facts" nor "data." These hearsay opinions are neither recorded nor verifiable objective evidence. Cf. Brennan v. State, 754 So.2d 1, 4 (Fla.1999) (concluding that the trial court did not err in allowing a medical examiner who did not perform the autopsy on the victim to testify as to cause of death because the medical examiner's opinion was based on objective evidence such as the autopsy report, a report by a forensic anthropologist, depositions, photographs, and dental records).
Further, the decisions on which the First District relied to support its conclusion that "[i]t is proper for an expert witness to consult with other experts in the same field in formulating an opinion" are distinguishable. Linn, 894 So.2d at 977. None of these cases involved expert testimony based on consultations with other experts who had no first-hand knowledge of the case. For example, in Capehart v. State, 583 So.2d 1009, 1012-13 (Fla.1991), this Court concluded that a medical examiner who did not perform the autopsy on the victim could properly testify as to the cause of death. The expert in Capehart formed her opinion based on the autopsy report, which was not admitted into evidence, and on the toxicology report, the evidence receipts, the photographs of the body, and all other paperwork filed in the case. See id. at 1013. The autopsy report, toxicology report, and photographs are clearly "facts or data" reasonably relied on by experts in the field. In Bender v. State, 472 So.2d 1370, 1371 (Fla. 3d DCA 1985), the expert psychiatrist relied on a CAT scan report that contained the opinion of the radiologist who read the test. Unquestionably, CAT scan reports are the type of "facts or data" reasonably relied on by doctors.[4]
However, assuming, as did the district courts in Linn and Schwarz, that section 90.704 allows an expert to testify even if his or her opinion is based in part on consultations with other experts, Florida courts have routinely recognized that an expert's testimony "may not merely be *1038 used as a conduit for the introduction of the otherwise inadmissible evidence." Erwin v. Todd, 699 So.2d 275, 277 (Fla. 5th DCA 1997); see also Riggins v. Mariner Boat Works, Inc., 545 So.2d 430, 432 (Fla. 2d DCA 1989) (recognizing a line of cases that "prohibits the use of expert testimony merely to serve as a conduit to place otherwise inadmissible evidence before a jury").
The rationale for this prohibition is twofold. First, allowing the presentation of otherwise inadmissible evidence merely because an expert relied on it in forming an opinion undermines the rules of evidence that would have precluded its admission. Cf. Gerber v. Iyengar, 725 So.2d 1181, 1185 (Fla. 3d DCA 1998) (concluding that by offering an expert's testimony regarding the expert's conversation with an author of a treatise, the defendant sought to use the expert's testimony to introduce inadmissible hearsay); Bunyak v. Clyde J. Yancey & Sons Dairy, Inc., 438 So.2d 891, 893 (Fla. 2d DCA 1983) (concluding that section 90.704 "does not permit an expert witness in one field to testify as to the expert opinion given to him by another expert" because "such testimony is inadmissible hearsay"). When an expert's testimony acts as a conduit for inadmissible hearsay, the evidence is presented to the jury without affording the opposing party an opportunity to cross-examine and impeach the source of the hearsay. See Gerber, 725 So.2d at 1185 (concluding that the result of allowing the expert's testimony to act as a conduit for inadmissible hearsay is that the "highly impeachable statement . . . was presented for the jury's consumption without affording . . . an opportunity to cross-examine").
Second, testimony that serves as a conduit for inadmissible evidence is inadmissible under section 90.403, Florida Statutes (2005), because its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of issues [or] misleading the jury." See Schwarz, 695 So.2d at 455 (holding that the expert should not have been allowed to testify that he consulted with other experts in his field because "[a]ny probative value would be `substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury . . .' § 90.403, Fla. Stat.") (alteration in original); Maklakiewicz v. Berton, 652 So.2d 1208, 1209 (Fla. 3d DCA 1995) ("[T]he presentation of the inadmissible evidence before the jury through the testimony of the officer as an accident reconstruction expert unfairly prejudiced the plaintiff and misled the jury by giving the inadmissible evidence the expert's imprimatur of approval and reliability."); Riggins, 545 So.2d at 432 (concluding that an expert opinion on blood alcohol level based exclusively on an inadmissible report "unfairly prejudices the plaintiff and misleads the jury by emphasizing otherwise inadmissible evidence and by placing an aura of scientific truth upon a document which is legally unreliable").
Federal Rule of Evidence 703 expressly recognizes the danger of allowing expert testimony to become a conduit for inadmissible evidence by creating a presumption against disclosing to the jury the inadmissible facts or data relied on by the expert in forming an opinion. The last sentence of rule 703, which was added in 2000, provides: "Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed.R.Evid. 703.
Usually, experts can testify that they formed their opinions in reliance on sources that contain inadmissible information *1039 without also conveying the substance of the inadmissible information. However, when the sources are the expert witness's colleagues who have responded to a case-specific inquiry by the expert, source and substance are blended. Informing the jury that the expert formed his or her opinion from consultations of this nature indicates a group consensus based on hearsay that would not be conveyed by testimony that the expert relied on records, tests, or reports from the patient or other medical providers directly involved in the diagnosis or treatment of the patient.
Further, opinion testimony by consensus is essentially immune to challenge. The opposing party is unable to cross-examine the nontestifying experts who participated in the consultation. Moreover, there is no way for the trial court to assess whether the consulting expert, upon whom the testifying expert relied in whole or in part, is herself qualified or had a proper foundation upon which to base an opinion. For example, did the testifying expert provide the expert or experts with all the pertinent facts and records? Also, there are no clear limits on how far consultations could extend. Would an expert be able to solicit opinions over the internet? Would the battle of the experts become a battle over how many other experts were consulted?
As the Fourth District recognized in Schwarz, the expert's testimony regarding the consultations serves only to bolster his or her opinion on the issue to which the expert is testifying. See 695 So.2d at 455. Under section 90.706, which allows the use of authoritative literature only on cross-examination, it is inappropriate to allow experts on direct examination to bolster their credibility or to supplement their opinions by "testifying that a treatise agrees with their opinion." Schwarz, 695 So.2d at 455; see also Theus v. State, 922 So.2d 391, 391 (Fla. 1st DCA 2006) (trial court erred in allowing expert witness to refer on direct examination to a scientific article that supported expert's decision not to conduct a physical examination of the victim); Quarrel v. Minervini, 510 So.2d 977, 978 (Fla. 3rd DCA 1987) ("Medical treatises cannot be used to bolster the testimony of a physician on direct examination."). This is consistent with the general rule that it is improper on direct examination to introduce evidence to support the credibility of a witness. See Rodriguez v. State, 842 So.2d 1053, 1053 (Fla. 3d DCA 2003) (trial court erred in allowing the victim of an alleged aggravated assault to testify that she obtained a restraining order after the incident); Simpson v. State, 824 So.2d 280, 282 (Fla. 4th DCA 2002) (trial court erred in "permitting the state to bolster the testimony of the officers when their testimony had not been impeached first").
We conclude that referring to consultations with other experts creates the danger of bolstering the credibility of the testifying expert's opinion without providing the opposing party the ability to effectively cross-examine the expert as to the basis for the opinion. Allowing the expert to testify on direct examination that he or she relied on consultations with other experts creates "too much of a possibility of an inference being drawn that these experts agreed" with the testifying expert. Schwarz, 695 So.2d at 455. We therefore hold as a matter of law that under the Florida Evidence Code an expert is not permitted to testify on direct examination that the expert relied on consultations with colleagues or other experts in reaching his or her opinion.

THIS CASE
In this case, Dr. Weaver-Osterholtz testified on direct examination that in order to determine the appropriate standard *1040 of care and whether Dr. Fossum complied with that standard, she presented the case to fellow urologists in two different forums. Despite the fact that Dr. Weaver-Osterholtz did not state that the other urologists she consulted agreed with her final opinion, this was the clear implication.
The fact that this is a medical malpractice case does not change the analysis. The dissent implies that our decision would require less than full disclosure when a medical expert is asked to testify as to the basis for his or her opinion on the prevailing professional standard of care. See dissenting op. at 1046. The argument that full disclosure requires that experts testify that they discussed their case with other experts in order to arrive at an opinion could apply to all cases, not just medical malpractice cases. As explained above, this type of testimony is inadmissible because it results in improper bolstering and any probative value is outweighed by the danger of unfair prejudice and of misleading the jury that the expert's testimony has the approval of other experts in the field.
The danger of unfair prejudice is especially pronounced when, as in this case, there are groups of colleagues with whom the expert conducts informal "curbside consults" regarding the particular facts of the case. There is simply no way for a party to effectively cross-examine an expert based on hearsay conversations with a group of individuals. Whether characterized as an impermissible conduit for hearsay or impermissible bolstering, such opinion testimony does not serve to advance the search for the truth.[5]
Dr. Weaver-Osterholtz stated that based on her own practice, she would not have used Dr. Fossum's "watch and wait" approach but would have inserted two stents to drain Beth's urinary system. It was only after she "presented the case . . . in a couple of different forums" that she made a determination about whether the defendant met the standard of care.[6] Allowing qualified experts to testify as to the prevailing professional standard of care under section 766.102(1), Florida Statutes (2005), does not permit experts to conduct a survey of a myriad of other experts or colleagues to derive a consensus on the standard of care. And we reject the dissent's reliance on the fact that this is a medical malpractice case to justify carving out a special rule. Experts are qualified to render opinions based on their experience, background, and training. In medical malpractice actions, the law imposes additional requirements to ensure that the expert has the necessary expertise. See 766.102(5), Fla. Stat. (2005). It would be *1041 contrary to the purpose of this statute to allow qualified experts to testify that they consulted with unidentified individuals who may or may not meet the requirements of section 766.102(5).
We conclude that the trial court erred in allowing Dr. Weaver-Osterholtz to testify that she consulted with colleagues and that this error was not harmless because the competing expert opinions on the proper standard of care were the focal point of this medical malpractice trial. Compare Donshik v. Sherman, 861 So.2d 53, 56 (Fla. 3d DCA 2003) ("Where, as here, the competing expert opinions, on both sides, were the focal point of the trial, we cannot deem the error in the introduction of the ACAS report to be harmless."), with Schwarz, 695 So.2d at 455-56 (holding that the error in allowing the expert to testify on direct that he consulted with other experts was harmless in a nonjury trial because "the trial judge was well aware of the weight to be given this testimony").

CONCLUSION
For the reasons set forth above, we hold that an expert is not permitted to testify on direct examination that the expert consulted with colleagues or other experts in formulating an opinion. Because the trial court's error in allowing this testimony was not harmless, we quash the First District's decision affirming the judgment for the defendant with directions to order a new trial. We approve the Fourth District's decision in Schwarz to the extent it is consistent with this opinion.
It so ordered.
LEWIS, C.J., and ANSTEAD, QUINCE, and CANTERO, JJ., concur.
WELLS, J., dissents with an opinion, in which BELL, J., concurs.
WELLS, J., dissenting.
I dissent. I conclude that conflict does not exist between the present case and Schwarz v. State, 695 So.2d 452 (Fla. 4th DCA 1997), and that jurisdiction should be discharged.
My departure from the majority stems from the majority opinion not being directed to the limited issue raised below in this case. The majority states that "the conflict issue . . . is whether experts can testify on direct examination that they relied on the hearsay opinions of other experts in forming their opinions." Majority op. at 1036. However, the issue framed by the majority was not the issue in the Linns' appeal to the First District Court of Appeal and was not decided by that court. The First District wrote: "[The Linns] contend that testimony given by the defendant's medical expert should not have been admitted in evidence, because it was based entirely on the hearsay statements of other doctors." Linn v. Fossum, 894 So.2d 974, 975 (Fla. 1st DCA 2004). The First District then specifically stated that the issue before it was "whether the opinion given by Dr. Weaver-Osterholtz at trial was based entirely on the hearsay statements of the other urologists." Id. at 978. The First District held, "Our review of the record convinces us that it was not." Id. The First District determined that in addition to talking with other urologists, Dr. Weaver-Osterholtz had reviewed medical records for approximately ten hours, read depositions of other witnesses, and relied on her own medical education, training, and experience. Id. at 978.
In order to justify its determination that conflict exists, the majority relies upon Judge Kahn's dissent. Majority op. at 1036. This is contrary to the repeated holdings of this Court that conflict must be determined within the four corners of the district court's majority decision. Reaves *1042 v. State, 485 So.2d 829 (Fla.1986). The majority here fails to explain how my recitation of the First District's issue was incorrect and not based on the four corners of the district court's majority decision. This Court's majority opinion only cites to what the district court stated the Linns contended. Our jurisprudence is clear that this Court's conflict jurisdiction is based not upon a party's contentions but, rather, is based upon a district court's majority's decision. Art. V, § 3(b)(3), Fla. Const. (Supreme Court may review any decision of a district court of appeal that expressly and directly conflicts with a decision of another district court or Supreme Court on the same question of law).
Additionally, in respect to the Linns' contention, in determining not only the conflict issue but also the substantive issue in this case, it is also crucial to recognize, as the district court's majority did, that the testimony challenged by the Linns was Dr. Weaver-Osterholtz's opinion about the standard of care. The record shows that the issue as to whether Dr. Weaver-Osterholtz could testify was initially presented to the trial judge prior to trial by the plaintiffs' motion in limine. The record discussion was:
THE COURT: What are you asking me to do, exclude her testimony based on
MR. SIPPLE: I'm asking you not to allow
THE COURT:standard of care in the community?
MR. SIPPLE: Yeah, I mean, she
THE COURT: How does another doctorhow does a doctor know what the standard of care is without talking to other doctors?
MR. SIPPLE: I think the testimony from all of the other doctors in the case will be that the standard of care is what II mean, I apply the standard of care, I mean
THE COURT: Each doctor says I knowI know what the standard of care is how I do it, and that's the way it's supposed to be done.
I mean, honestly, let me just say this, it's about the same thing, Counsel, that I run into on attorney's fees, when I'm trying to set attorney's fees. One lawyer ask[s] another lawyer, "Well, what is the normal and usual fee for this type of activity from an attorney representation in this area?" Well, the only way that I know that an attorney is going to know that is by asking other lawyers, by getting that information from other attorneys in order to make that determination. And I think the law is clear that that's one of the things that a judge is supposed to determine in setting attorney's fees.
Now, same thing in a medical case. What is the standard of care? Well, in a particular area or community, I think standard of care in my opinion is, and based on all of the case law that I've ever seen, it'swell, what is the normal procedure followed by professionals in this area in a particular location or region of the country, and how are you going to know that? Well, only way you're going to know it is by asking other people, unless you happen toI mean, I can't see someone standing watch over other doctors while they perform or diagnose cases, so the only way you're going to know that is by examining the records or talking to the physicians in those other cases and situations.
From this review of the record, it is plain that the issue raised to the trial judge and decided by the First District in the present case was not the issue before the Fourth District in Schwarz v. State, 695 So.2d 452 (Fla. 4th DCA 1997). *1043 Schwarz involved neither a hearsay objection nor a standard of care question. The question in Schwarz was whether the pathologist who testified about the cause of death could testify on direct examination that he had consulted with other pathologists about the cause of death. The Fourth District decided the legal issue in Schwarz not on the issue of hearsay but rather on the issue of whether the pathologist could bolster his opinion by testifying that he had consulted with other experts as to the cause of death.
The First District correctly determined that Schwarz did not conflict with its decision in the present case because Schwarz was not decided on the basis of a hearsay objection:
[T]he plaintiffs in this case are not arguing that Dr. Weaver-Osterholtz improperly bolstered her testimony. This point was not made in the trial court, nor was it made in this court. The appellants mentioned the alleged improper bolstering in passing in their initial brief, but it was clearly not the thrust of their argument. Nor could it have been. The argument was that Dr. Weaver-Osterholtz's opinion was based entirely on hearsay.
Linn, 894 So.2d at 979 (emphasis added). I agree with the First District. We should discharge jurisdiction.
Moreover, I dissent from the majority's resolution of the issue it does consider, specifically as it applies in the instant case to testimony about the standard of care. The very definition of standard of care in section 766.102(1), Florida Statutes (2005), requires proof of what is "recognized as acceptable and appropriate by reasonably prudent similar health care providers." This obviously requires discussions with similar health care providers. Standard of care is a particularized requirement of medical malpractice litigation. The opinion in this case should be limited to the medical malpractice context and to specific issues which by their nature require knowledge by the expert of what others in a particular profession do under similar circumstances. The trial judge, who demonstrated on the record that he had trial experience in hearing expert testimony on such subjects, made the following insightful comment at the time of the motion in limine hearing:
THE COURT: So you don't find out what the standard of carehow do you find out what other attorneys are charging in aon an hourly rate representing a plaintiff in a lawsuit?
MR. SIPPLE: Through your experience practicing in the community.
THE COURT: Well, that's fine in theory, but in practicality, how do you do it? How do you knowhow do you know what Mr. Daniel is charging his client if someone were to ask you if you were familiar with the attorney's fees in a particular case? The only way that you would know, the only way that you will know is for him to tell you or for you to look at his books or records and yet, like I say, in an issue of expert opinion on attorney's fees that's one of the things we have to testify to.
So I think we're in the same situation here. Standard of care, in my opinion, necessarily requires the use of hearsay evidence in arriving at an opinion on standard of care in a community.
Now, in your example when you say, "Well, you practice with the other doctors." Well then, you might be personally familiar with the standard of care in your little clinic or in your hospital, but you takeparticularly somewhereyou take a big city like Miami or Chicago or New York City, you might have 500 hospitals and 500 different areas. And no one doctor is going to be able to *1044 testify just because something might be the standard of care in his clinic or in the operations in which he's involved. So, honestly, I don't know how in the world I can exclude reliance on hearsay as it relates to forming an opinion on standard of care. So I wouldn't be inclined to do that for that reason.
The First District agreed with the trial court's assessment:
The testimony at issue in this case is an opinion regarding the proper standard of medical care. According to section 766.102(1), Florida Statutes, the prevailing standard of care for a health care provider is "that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." This subject, by its nature, requires an understanding of what other experts in the field consider appropriate. A doctor would have to communicate in some way with other health care professionals to know what they regarded as "acceptable and appropriate."
The fact that Dr. Weaver-Osterholtz spoke with other urologists in a setting she described as "curbside consult" does not lead us to conclude that her opinion was inadmissible. It is proper for an expert witness to consult with other experts in the same field in formulating an opinion. See, e.g., Bender [v. State, 472 So.2d 1370 (Fla. 3d DCA 1985)]; Capehart v. State, 583 So.2d 1009 (Fla.1991); see also Lewis v. Rego Co., 757 F.2d 66 (3d Cir.1985); United States v. Brown, 299 F.3d 1252, 1257 (11th Cir.2002) (interpreting the federal rules). And this is particularly true in the health care field, given the statutory definition of the standard of care. We would expect a doctor to speak with other doctors in the same field, either in connection with a particular case or in a more general setting. Otherwise, it would be difficult to know the proper standard of medical care as defined by law.
Linn, 894 So.2d at 977.
In considering an issue similar to that raised in the trial court and First District, the Supreme Court of Oregon, in Jefferis v. Marzano, 298 Or. 782, 696 P.2d 1087, 1092 (1985), stated:
It is clear that there can be no valid objection to the fact that a witness's opinion rests upon hearsay in the sense that the information he relies upon to know the appropriate medical practice is derived in part from extrajudicial statements of others. Such statements may include lectures in medical school, writings of various kinds and conversations with colleagues. It is by assimilation of hearsay of this sort that expert opinions are in fact, for the most part, made, and to demand education independent of the statement of others is to demand what does not exist and will not be forthcoming. See Weinstein, Mansfield, Abrams and Berger, Cases and Materials on Evidence 399 (7th ed.1983).
None of these objections was well taken. The appropriate medical practice is most commonly proven by learning what other specialists in the field do in the area. The appropriate medical practice in this case could have been observed by the physician at a hospital or in any other clinical setting; learned at a staff meeting at a hospital or at an educational seminar; ascertained from reading medical literature; and, finally, the appropriate medical practice could be ascertained by discussing the proper method for sorting out Pap smear reports with other doctors in the community as to what they do.

*1045 All this information is what a specialist actually uses to decide what medical practice to utilize in his or her chosen specialty. All this information is usually and properly relied upon by specialists when making their day-to-day life and death decisions in the practice of medicine. It is only incidental that this same information may be used by a physician in rendering an expert opinion in court.
I adopt and would follow Oregon's well-reasoned view on this subject.
The majority opinion attempts to distinguish the Oregon Supreme Court's decision. But the majority points to no reasonable basis for a distinction. Nor does the majority dispute the plain logic of the reasoning of the Oregon Supreme Court. The majority does not explain how a physician learns of the standard of care other than as set forth by the Oregon Supreme Court. Importantly, the majority does not explain how the standard of medical care can be proven under its decision.
This conclusion is consistent with the Florida Evidence Code. Section 90.704, Florida Statutes (2005), states:
The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence.
Soon after the adoption of section 90.704, the Third District Court of Appeal correctly observed that the very purpose of the statute was "to bring the judicial practice into line with the practice of the experts themselves when not in court." Bender v. State, 472 So.2d 1370, 1372 (Fla. 3d DCA 1985) (quoting § 90.704, Fla. Stat. Ann. (1979) (Law Revision Council Note 1976)). The majority, without citing to any authority, asserts in its opinion that "by its plain terms section 90.704 is restricted to `facts or data reasonably relied on' by experts. Opinions of other experts who have no first-hand knowledge of the case that are solicited by the testifying expert constitute neither `facts' or `data'." Majority op. at 1037. Even accepting the majority's unsupported view to be correct in respect to opinions on issues such as cause of death in Schwarz, it cannot be correct as to an opinion on the standard of care which, as the trial judge in this case recognized, is necessarily formulated in part by discussions among peers and which, as the statute defines, is based on what is recognized by other similar physicians.
Determining whether the evidence that is the basis for an expert's opinion may be admitted at trial is a matter left to the trial judge's discretion.[7] I do not find that the trial court abused its discretion in allowing the jury to hear the basis for Dr. Weaver-Osterholtz's testimony in answer to the question as to what she did to determine the standard of care for the treatment in this case. That was the question to which the objection was made and the question which is at issue in this case. I believe that a medical expert must be permitted to testify truthfully and completely in answer *1046 to that question. The truthful and complete response to the question is what was answered in this case, which is that the basis for the medical expert's opinion as to what the standard of care is includes training, experience, reading text and treatises, and talking with other physicians who provide similar care and treatment.
The majority appears to fall back upon an argument based upon section 90.403, Florida Statutes, in stating "this type of testimony is inadmissible because any probative value is outweighed by the dangers of unfair prejudice and of misleading the jury that the expert's testimony has the approval of other experts in the field." Majority op. at 1040. However, this argument was not made to the trial court, is procedurally barred, and it is unfair to rely upon it in this Court. Similarly, the argument in the majority's footnote 6 was not made below.
Finally, assuming without agreeing that the trial judge abused his discretion in overruling the hearsay objection to the question as to the basis for the opinion as to the standard of care, clearly that error was harmless. Both sides presented lengthy testimony from experts. There was full and complete cross-examination of both experts. The petitioner does not explain how the allowing of the defendant's expert to explain that she conferred with other doctors as to what the standard of care was became a focus in the trial. In fact, the testimony that petitioner points to in petitioner's brief as being the objectionable testimony did not come in answer to the objected-to question. Rather, that testimony was in response to questions asked by petitioner's counsel in cross-examination. The petitioner does not point to any of the objectionable testimony being brought out in closing argument. Petitioner has not even made the closing argument a part of the appellate record. See Applegate v. Barnett Bank of Tallahassee, 377 So.2d 1150, 1152 (Fla.1979) (appellant has burden to provide record of trial proceedings in order to demonstrate reversible error). I conclude that the appellate record does not support a determination that the trial judge committed reversible error.
For the reasons stated above, if jurisdiction is not discharged, I would affirm the decision of the First District.
BELL, J., concurs.
NOTES
[1] The First District's majority attempted to distinguish Schwarz by highlighting what it believed were two "critical differences" between its decision and Schwarz. See Linn, 894 So.2d at 979. First, the district court determined that the Linns did not argue that Dr. Weaver-Osterholtz improperly bolstered her testimony. See id. However, as noted above, the language the Linns used in their argument is almost identical to the rule articulated in Schwarz. The First District's second "critical difference," that "Dr. Weaver-Osterholtz did not testify on direct examination that other experts agreed with the opinion she was about to give," id., also does not meaningfully distinguish Schwarz. The Fourth District in Schwarz specifically stated: "The precise issue before us is not whether Dr. Burton could testify that other experts in his field agreed with him, but rather whether he could testify that he had consulted other experts in his same field." Schwarz, 695 So.2d at 455.
[2] Section 90.706 provides:

Statements of facts or opinions on a subject of science, art, or specialized knowledge contained in a published treatise, periodical, book, dissertation, pamphlet, or other writing may be used in cross-examination of an expert witness if the expert witness recognizes the author or the treatise, periodical, book, dissertation, pamphlet, or other writing to be authoritative, or, notwithstanding nonrecognition by the expert witness, if the trial court finds the author or the treatise, periodical, book, dissertation, pamphlet, or other writing to be authoritative and relevant to the subject matter.
[3] Federal Rule 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.
[4] The Third Circuit Court of Appeals' decision in Lewis v. Rego Co., 757 F.2d 66 (3d Cir. 1985), which provides the most persuasive authority for the First District's conclusion, can also be distinguished. In that case, the testifying expert's consultation was with the expert who first examined the alleged defective equipment. See id. at 73-74.
[5] The case cited by the dissent is distinguishable. See Jefferis v. Marzano, 298 Or. 782, 696 P.2d 1087 (1985). Jefferis involved a defendant in a medical malpractice case who was permitted to testify why he believed that a certain procedure that he followed for reviewing Pap smear test results was proper. He explained that his practice was based on several factors: (1) he used this practice in his training as a resident specializing in obstetrics and gynecology and in his service training; (2) this had been his practice in handling hundreds of patients over a ten-year period; and (3) the practice was used at the Cancer Referral Center for Wisconsin and by a Dr. Adolph Stafl, one of the foremost experts in the field. See id. at 1091-92. This is an entirely different situation than allowing an expert to testify that his or her opinion on the standard of care is based, in part, on hearsay conversations with colleagues that took place after the incident giving rise to the lawsuit.
[6] Although we do not decide the issue, if an expert such as Dr. Weaver-Osterholtz cannot form an opinion on the appropriate standard of care based on her own past practices and knowledge in the field, perhaps that expert is not qualified to render the opinion.
[7] "Admission of evidence is within the discretion of the trial court and will not be reversed unless there has been a clear abuse of that discretion." Evans v. State, 808 So.2d 92, 102 (Fla.2001) (quoting Ray v. State, 755 So.2d 604, 610 (Fla.2000)). A trial court applies the following test in making a determination on the admission of such evidence:

Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.
§ 90.403, Fla. Stat. (2005).