MARSTILLER, J.
 

 This is an appeal from a final judgment in a medical malpractice lawsuit.
 

 Daniel Duss was diagnosed with cerebral palsy shortly after his birth on December 3, 2002. In 2003, a lawsuit was filed on his behalf alleging that the obstetrician who delivered him, Martin A. Garcia, M.D., was negligent in using a fetal vacuum extractor during the delivery, and that his negligence caused Daniel to sustain a brain injury, leaving him with cerebral palsy. When the case finally made it to trial in August 2010, after earlier ending in mistrial, the plaintiff put on four medical experts — one on standard of care and three on causation. The gist of their testimony was that Dr. Garcia breached the standard of care by needlessly using the vacuum extractor six times to deliver Daniel, and that his actions caused Daniel to suffer an ischemic
 
 [1]
 
 stroke which, in turn, caused brain injury. The defendants’ experts testified that Dr. Garcia’s use of the vacuum extractor fell within the standard of care, that use of the device cannot cause an ischemic stroke, and that Daniel’s strokes and brain injury resulted from a placental abnormality. The jury rendered a verdict in favor of the defendants, answering the question, “Was there negligence on the part of Martin A. Garcia, M.D., which was a legal cause of loss, injury, or damage to Daniel Duss?” in the negative. The trial court entered final judgment accordingly.
 

 Appellant seeks reversal of the final judgment and a new trial on two grounds. First, Appellant argues the trial court incorrectly excluded expert testimony establishing that Dr. Garcia’s breach of the standard of care created obstetrical conditions known to increase the likelihood of the type of neurological injury Daniel suffered. Appellant thus was “unable to establish a link in the chain of causation between Dr. Garcia’s negligence and the ischemic stroke [Daniel] ultimately suffered.” Second, Appellant asserts that the trial court allowed Appellees to improperly bolster their experts’ opinions on causation using authoritative publications. In so doing, Appellant argues, the court effectively diminished the credibility of his experts on the ultimate issue of liability. For the following reasons, we affirm the final judgment.
 

 I. Excluded Testimony of Standard of Care Expert, Dr. Schifrin
 

 Dr. Barry S. Schifrin, an OB/GYN, was Appellant’s only expert on standard of care. He testified that, based on his review of the labor and delivery reports, no circumstances were present to make a vacuum-assisted delivery necessary. Daniel was “making progress” and showed “no obvious fetal distress or any fetal problem” prior to use of the vacuum. According to Dr. Schifrin, the fetal heart rate tracings showed no evidence of oxygen deprivation such that vacuum intervention was necessary. Under the prevailing standard of care, these circumstances, together with the fact that this was a high-risk delivery of twins at only thirty-five weeks’ gestation, indicated a vacuum extractor should not be used. He opined further that Dr.
 
 *361
 
 Garcia’s application of the device six times in approximately thirty minutes was unreasonable.
 

 Dr. Schifrin explained that misuse of the vacuum extractor could stretch the arteries leading to the infant’s brain and, because of the increased pressure from the vacuum, diminish blood flow to the organ. He testified that after Dr. Garcia began using the vacuum, Daniel’s fetal heart rate tracings showed decelerations, which likely represented ischemic events. When Appellant’s counsel asked Dr. Schifrin for his opinion on whether “obstetrical circumstances or conditions existed which could result in ischemic injury,” Appellees’ counsel objected and, after conducting voir dire, argued that the doctor was not qualified to give expert opinion on the cause of Daniel’s neurological injury. The trial court sustained Appellees’ objection. But it permitted Dr. Schifrin to testify that “the evidence of ischemia on the tracings was the result of misuse of the vacuum extractor,” and that Daniel’s ischemia resulted from Dr. Garcia’s failure to use reasonable care in using the device and in managing the labor and delivery process.
 

 The court later permitted Appellant to make the following proffer of Dr. Schifrin’s opinion:
 

 Q: [D]o you have an opinion as to whether Dr. Garcia’s failure to provide reasonable care to Daniel Duss created the obstetrical conditions known to have the potential to cause neurological injury in newborns?
 

 A: Yes.
 

 Q: What’s your opinion, please?
 

 A: My opinion is that he in fact put the baby in harm’s way by the conduct of the second stage of labor.
 

 Acknowledging Dr. Schifrin’s lack of expertise on the issue of whether Dr. Garcia’s alleged negligence caused Daniel’s brain injury, Appellant’s counsel asserted that the proffered opinion went not to causation of the injury but to whether Dr. Garcia’s actions “created” obstetrical conditions “known to create an environment which can cause neurological injury.... ” The court disagreed, explicitly finding that Dr. Schifrin’s opinion went to causation or was “at least implicit in the question of causation.... ”
 

 “A trial court is to be afforded broad discretion in determining the subject on which an expert may testify in a particular trial. The trial court’s decision will only be disregarded if that discretion has been abused.”
 
 Angrand v. Key,
 
 657 So.2d 1146, 1148 (Fla.1995) (internal citations omitted). The expert here, Dr. Schifrin, was only qualified to testify on the standard of care and on whether Dr. Garcia breached it. Any testimony linking breach of the standard of care to Daniel’s neurological injury — ischemic stroke — unquestionably would go to causation and, we believe, would exceed the scope of matters on which Dr. Schifrin was qualified to give an opinion at trial. We agree with the trial court that Dr. Schifrin’s proffered opinion went to causation inasmuch as it connected Dr. Garcia’s allegedly sub-standard obstetrical actions and decisions to “neurological injury in newborns.” We therefore find no abuse of discretion by the court in excluding the testimony.
 

 In any event, Dr. Schifrin stated several times that Dr. Garcia’s use of the vacuum caused Daniel’s ischemia, and told the jury that a vacuum extractor could cause the type of ischemic stroke Daniel suffered. Moreover, the record shows Appellant was'able to present expert testimony firmly connecting Dr. Garcia’s use of the vacuum extractor to Daniel’s stroke. Specifically, Appellant’s pediatric neurologist, Dr. Ronald S. Gabriel, testified that
 
 *362
 
 vacuum extraction could produce the kind of brain injury Daniel sustained. And in his opinion, Daniel suffered “an injury as a consequence of the vacuum extraction which caused stretching, twisting, torsion, even kinking of the vessels that go to the brain. It caused, therefore, the blood in those vessels to be reduced, reducing the amount of blood that went to the brain.... ” Additionally, Appellant’s expert neonatologist, Dr. Marcus Hermansen, diagnosed Daniel’s ischemic stroke as a mechanical injury caused by use of the vacuum extractor. He opined that the pull of the vacuum stretched the baby’s blood vessels, blocked the flow of blood to the brain, and resulted in a stroke. Thus even if the trial court had erred in excluding Dr. Schifrin’s testimony, Appellant suffered no prejudice from the court’s ruling.
 

 II. Bolstered Opinions of Defense Experts
 

 Appellees’ theory of the case was that there is no link between strokes in infants and vacuum-assisted delivery, and that Daniel’s neurological injury resulted from a placental abnormality. Among Appel-lees’ medical experts were Dr. John Thorp, who testified on standard of care, and Dr. David Schwartz, an expert on placental pathology.
 

 A. Dr. Thorp
 

 Dr. Thorp is an OB/GYN specializing in the care of mothers and fetuses with medical conditions or risk factors for poor outcomes. He also is a clinical epidemiologist, studying the causes of perinatal
 
 [2]
 
 conditions such as preterm birth, preec-lampsia
 
 [3]
 
 and cerebral palsy. He testified he has published approximately three hundred articles, has written at least eighteen textbook chapters on topics within his fields of expertise including “the role of perinatal factors in brain disorders,” and lends his expertise in perinatal epidemiology to several medical journals to conduct peer-review of articles submitted by others for publication.
 

 Dr. Thorp opined that it was appropriate for Dr. Garcia to “expedite” the delivery of Daniel because, among other reasons, the twins were at thirty-five weeks, their mother had preeclampsia, and the second twin also needed to be delivered as quickly as possible. He testified that Dr. Garcia adhered to the standard of care in managing the labor and delivery, that he appropriately applied the vacuum extractor, and that he met all the guidelines for using the device in delivering Daniel. On the general use of vacuum extraction, Dr. Thorp testified, without objection:
 

 [M]y fourth opinion, and why I’m sort of amazed that I’m here — and this gets to epidemiology and causality, but vacuum extraction is not a risk factor for — for fetal stroke, for in útero stroke. Vacuum extractors can damage baby’s head, it can fracture skulls, it can cause bleeding within the head, but it is not a risk factor for stroke.
 

 [[Image here]]
 

 There’s been a huge natural experiment over the last 60 years since the vacuum extractors were first introduced, and now thousands of babies are delivered by vacuum extraction in the U.S. every — every year. Given the rarity of intrauterine stroke, which is about one in a thousand, if vacuum extraction were a cause, there would have been a signal
 
 *363
 
 that would be detectable. That hasn’t occurred.
 

 When asked to explain to the jury why he does not believe the vacuum caused Daniel’s ischemic stroke, Dr. Thorp responded:
 

 Well, one is the huge natural experiment that’s been done with thousands of babies being born via vacuum extraction and no association with — with stroke. Secondly, in Daniel’s case, there were risk factors for in útero stroke, his mom’s preeclampsia and his placental pathology that demonstrated thrombi within the baby’s — clots within the baby’s vascular spaces which is associated with stroke.
 

 Appellees’ counsel later asked Dr. Thorp, “You told us about your publications, your writing, your seminars, your various work in the field of epidemiology. Have you ever heard of the concept before this lawsuit that a vacuum assist can cause an ischemic stroke?” Over objection, the doctor answered, “I never heard of it. And I would flunk somebody on oral exams who told me that such a relationship existed. I am absolutely unaware.”
 

 The trial court’s ruling on the admissibility of evidence is reviewed for abuse of discretion, subject to correct interpretation of the evidence code and applicable ease law.
 
 See Dortch v. State,
 
 63 So.3d 904, 906 (Fla. 1st DCA 2011), and cases cited therein. As a rule, a party may not introduce evidence to bolster a witness’ credibility before it has been attacked.
 
 See Linn v. Fossum,
 
 946 So.2d 1032, 1039 (Fla.2006). Appellant cites several cases stating that a party may not use authoritative literature to bolster the opinion of an expert witness on direct examination, and argues that the trial court allowed Appellees to do so with Dr. Thorp using his own publications.
 
 See, e.g., id.
 
 at 1036;
 
 Erwin v. Todd,
 
 699 So.2d 275, 278 (Fla. 5th DCA 1997);
 
 Medina v. Variety Children’s Hosp.,
 
 438 So.2d 138, 139 (Fla. 3d DCA 1983);
 
 Tallahassee Mem’l Reg’l Med. Ctr. v. Mitchell,
 
 407 So.2d 601, 602 (Fla. 1st DCA 1981);
 
 see also
 
 § 90.706, Fla. Stat. (2010) (providing that authoritative publications may be used to cross-examine expert witnesses). We conclude, notwithstanding the bombastic response, that the question Appellees’ counsel posed was not improper bolstering, but rather a fair follow-up to Dr. Thorp’s unchallenged testimony about the “huge natural experiment” and lack of evidence linking vacuum assisted delivery to ischemic stroke in infants.
 
 [4]
 
 The trial court therefore did not err in allowing the question.
 

 B. Dr. Schwartz
 

 A placental pathologist and epidemiologist, Dr. Schwartz testified that preec-lampsia, which Daniel’s mother developed during pregnancy, causes a woman’s uterus to become incapable of supplying an optimal amount of blood to the placenta — a condition called uteroplacental malperfusion. The diminishment of blood supply can begin undetected, he testified, weeks before the mother shows signs of preec-lampsia. Dr. Schwartz studied slides containing tissue samples taken from the placentas of Daniel’s mother post delivery. The samples showed signs of malperfusion. He also observed blood clots in the samples from the placenta that nourished Daniel in útero; he saw similar blood clots in the umbilical vein, as well. These and other observations led Dr. Schwartz to conclude that Daniel’s fetal blood abnormally tended to form clots. Based on the mother’s history of preeclampsia and on
 
 *364
 
 conditions seen in the placental tissue samples, Dr. Schwartz opined that Daniel’s brain injury resulted from chronic utero-placental malperfusion and from the “hy-percoagulable state” of his blood.
 

 Dr. Schwartz told the jury that the placental specimens he studied showed signs of uneven accelerated maturation (“UAM”) caused, he believed, by insufficient blood flow. While testifying, Dr. Schwartz used a demonstrative aid containing images of a healthy uterus and one with UAM. Also shown was a chart that Dr. Schwartz described thusly:
 

 This is an outcomes table from the largest study of birth injury that was ever performed in the United States. It is conducted by the National Institutes of Health and at 12 different university hospitals around the country. They involved over 50,000 pregnant women, followed them through them pregnancies, collected their placenta, had them diagnosed by placental pathologists, looked at the babies and followed the babies until they were seven years of age to see what happened to them.
 

 He went on to explain that the data shows preeclampsia is “probably the strongest” risk factor for UAM. He testified further that of the “five bad outcomes of pregnancy” the National Institutes of Health (“NIH”) found most often associated with UAM, “neurological abnormality” has a 99.9 percent statistical association.
 

 An expert can base his or her opinion on facts or data that are not admissible at trial. § 90.704, Fla. Stat. (2010). But the expert can neither bolster his or her opinion with a treatise, article, study, etc., nor serve as the conduit for inadmissible hearsay.
 
 See Linn v. Fossum,
 
 946 So.2d at 1036;
 
 Doctors Co. v. Dep’t of Ins.,
 
 940 So.2d 466, 470 (Fla. 1st DCA 2006). “Experts cannot, on direct examination, bolster their testimony by testifying that a treatise agrees with their opinion.”
 
 Liberatore v. Kaufman,
 
 835 So.2d 404, 407 (Fla. 4th DCA 2003). And “[s]ection 90.706 does not permit statements in a learned treatise to be used as substantive evidence since the treatise would be hearsay if offered as substantive evidence.”
 
 Donshik v. Sherman,
 
 861 So.2d 53, 56 (Fla. 3d DCA 2003). This is so because “the opposing party cannot cross-examine and impeach the source of the hearsay.”
 
 In re S.E.,
 
 946 So.2d 620, 622 (Fla. 2d DCA 2007).
 

 Appellees posit that it is permissible for an expert to testify about the results of a government study such as the NIH study at issue here. For support, they rely on
 
 Kloster Cruise, Ltd. v. Rentz,
 
 733 So.2d 1102 (Fla. 3d DCA 1999), and
 
 Houghton v. Bond,
 
 680 So.2d 514 (Fla. 1st DCA 1996). At issue in
 
 Kloster Cruise
 
 was whether an expert witness could testify about weather data from the National Climatic Data Center. The court held that, assuming the data was not independently admissible, the expert could present the information on direct examination as the basis for his opinion. 733 So.2d at 1103. “That is so because the underlying data was the beginning point for analysis, but some further analysis was required by the expert....”
 
 Id.
 
 Similarly, in
 
 Hough-ton,
 
 we held it permissible for an accident reconstruction expert to testify about government-conducted crash test data he used to formulate his opinion about the two-car collision underlying the litigation. 680 So.2d at 522. “This testimony was clearly intended to aid the jury in understanding the [expert’s] opinion ... and it was not a conduit for inadmissible hearsay....”
 
 Id.
 
 Here, Dr. Schwartz used the NIH study data to explain to the jury why he concluded that the preeclampsia Daniel’s mother developed during pregnancy caused the abnormality he observed in samples taken from her placenta, and why he concluded that the abnormality contributed in part to Daniel’s brain injury. We therefore agree
 
 *365
 
 with Appellees that under
 
 Kloster Cruise
 
 and
 
 Houghton,
 
 the trial court did not abuse its discretion in allowing Dr. Schwartz to testify about the study results.
 
 [5]
 

 III. Conclusion
 

 The trial court correctly precluded Appellant’s standard of care expert, Dr. Schifrin, from testifying that Dr. Garcia’s alleged breach of the standard of care created circumstances from which brain injury to a newborn likely occurs. Such testimony went to causation, and Dr. Schif-rin was not qualified to give an opinion on that subject. Further, the court did not permit improper bolstering of testimony by Appellees’ experts, Drs. Thorp and Schwartz. Finding no error by the trial court, we AFFIRM the final judgment on appeal.
 

 SWANSON, J., Concurs; WETHERELL, J., concurs in result only.
 

 [1]
 

 . Ischemia is defined as "[l]ocal anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply.”
 
 Stedman's Medical Dictionary
 
 803 (25th ed. 1990).
 

 [2]
 

 . Perinatal means "[o]ccurring during, or pertaining to, the periods before, during or after the time of birth.”
 
 Stedman’s Medical Dictionary
 
 1166 (25th ed. 1990).
 

 [3]
 

 . Preeclampsia is hypertension brought on by pregnancy.
 
 Id.,
 
 at 1251.
 

 [4]
 

 . Notably, Appellant’s neonatologist, Dr. Her-mansen, testified on cross-examination that he could not recall one case involving vacuum extraction and stroke in the more than one thousand cases he has reviewed in the past twenty years.
 

 [5]
 

 . Like the court in
 
 Kloster Cruise,
 
 we were not asked, and therefore do not address, whether the NIH data would have been independently admissible.
 
 See American Motors Corp. v. Ellis,
 
 403 So.2d 459, 468-69 (Fla. 5th DCA 1981) (holding that trial court properly admitted into evidence United States Department of Transportation study on crash severity statistics under the public records exception to the hearsay rule).