940 So.2d 466 (2006)
The DOCTORS COMPANY, Appellant,
v.
STATE of Florida, DEPARTMENT OF INSURANCE as Receiver of Caduceus Self-Insurance Fund, Inc., Appellee.
No. 1D05-5643.
District Court of Appeal of Florida, First District.
September 13, 2006.
Rehearing Denied November 2, 2006.
*467 Arthur J. England, Jr., and Edward G. Guedes of Greenberg Traurig, P.A., Miami; Barry Richard and M. Hope Keating of Greenberg Traurig, P.A., Tallahassee; William R. Clayton of Greenberg Traurig, P.A., Fort Lauderdale; Michael P. Dickey of Barron, Redding, Hughes, Fite, Fensom, Sanborn & Kiehn, Panama City, for Appellant.
Eric Scott, Senior Attorney, Department of Financial Services, Tallahassee; Theodore R. Doran, Aaron R. Wolfe, Scott R. Rost, and Carolyn S. Ansay of Doran, Wolfe, Rost, Ansay & Kundid, Daytona Beach, for Appellee.
PER CURIAM.
Appellant, The Doctors Company, appeals an adverse final judgment awarding the Department of Financial Services $17.9 million in damages and prejudgment interest in a breach of contract action. Appellee is the receiver of Caduceus Self Insurance Fund Inc., a self-insurance medical malpractice trust. Appellant asserts that the trial court reversibly erred by excluding the testimony of Appellant's expert witnesses and by denying Appellant's motion for a continuance filed on the eve of trial.
We affirm because the trial court did not err on either issue and therefore did not abuse its discretion.

Factual Background
Caduceus was created by several Florida physicians in the 1970s. In 1998, Caduceus entered into a contract with Appellant, a California-based insurance entity looking to expand its operations into Florida. Under the terms of the Master Agreement, Appellant acquired Caduceus's offices, including its staff and its relationships with its agents throughout Florida. Appellant primarily authored the Agreement. Both parties agree that the Agreement is "unambiguous, integrated, and should be enforced pursuant to [its] clear terms."
*468 In exchange for Caduceus's assets, Appellant agreed to pay Caduceus business fees for each new insured and for the cumulative profit generated by its Florida operations from 1999-2002. The Agreement specifically defined the term "cumulative profit."
Although Appellant succeeded in Florida, it declined to pay any new business fees or cumulative profit to Caduceus. Caduceus had planned to pay its malpractice claims with money received from Appellant, but when Appellant failed to pay, Caduceus lacked sufficient cash to pay its claims. The State declared Caduceus insolvent and placed it in receivership. Under the liquidation order and Chapter 631, Florida Statutes (2000), Appellee was responsible for collecting all debts owed to Caduceus. Appellee determined that Appellant failed to account for, calculate, and pay Caduceus the cumulative profit earned by Appellant, as required by the Agreement. Accordingly, Appellee filed a breach of contract action in February 2002.

Procedural and Evidentiary Context of Trial Court's Rulings
In August 2004, the trial court told both parties that once the court set the case for trial, it would not postpone the trial date. Nearly six months later, approximately three years after it filed suit, Appellee requested that the court set a trial date, and Appellant did not object.
In April 2005, the trial court issued an order setting the case for trial in September 2005. The order required Appellee to list and designate all of its witnesses no later than 90 days before trial. Appellant was required to list its witnesses no later than 60 days before trial. The order warned the parties that no "document or witness not contained in the above-referenced lists will be permitted to be introduced or to testify at the time of trial, except by order of the court after showing of good cause." (Emphasis added.)
In May 2005, Appellant sent Appellee two interrogatories. In response to one interrogatory, Appellee listed its expert witness, Edward Buttner, a certified public accountant, and later supplemented its answer with a detailed explanation of Mr. Buttner's opinion and a full description of his calculation of damages. In July 2005, Appellant disclosed the name of its expert, James Schacht, but conducted little discovery and took no depositions before this time.
One day before trial Appellant moved to amend its witness list, seeking to add Jeff Donaldson, Chief Actuary, as a witness. The trial court denied Appellant's motion, finding that (1) the issues sought to be addressed by Mr. Donaldson were "obvious and apparent"; (2) Appellant waited too long to disclose Mr. Donaldson; and (3) allowing Mr. Donaldson to testify would prejudice Appellee.
At trial, Appellee's expert, Mr. Buttner, testified that he calculated the cumulative profit due to Appellee based on Appellant's annual statements and other data provided by Appellant. Mr. Buttner testified that based on this data, Appellant generated $14.1 million in cumulative profit which it failed to pay Caduceus, as required under the Agreement.
During Appellant's case-in-chief, Mr. Schacht testified as an "expert in the field of insurance industry transactions and custom and usage." Appellee objected to his expert opinion testimony based on section 90.705(2), Florida Statutes (2005). Appellee then conducted a thorough voir dire of Mr. Schacht, and Appellant proffered his testimony. On proffer, Mr. Schacht testified that he is neither a certified public accountant nor an actuary, and that he had spent no more than 20 hours preparing for *469 trial. Mr. Schacht testified that he arrived at his opinion by reviewing deposition summaries completed by two subordinate employees. These employees also reviewed Mr. Buttner's report for Mr. Schacht.
Mr. Schacht further testified that Mr. Buttner's cumulative profit calculation was flawed because it failed to take into account loss reserves, as required under Florida law, therefore, Mr. Buttner's profit calculation was somehow inflated. Mr. Schacht further claimed that Mr. Buttner employed defective methodology by equating the term "collected premium" with the amount of reported written premiums, even though the written premiums may not have actually been received during the contractual period. Mr. Schacht, however, did not, and could not, provide his own "cumulative profit" calculation, and he could neither agree nor disagree with any of the figures which formed the basis of Mr. Buttner's calculation.
After hearing arguments regarding Mr. Schacht's testimony, the trial court granted Appellee's motion to exclude his testimony. The trial court found that Mr. Schacht's testimony was not relevant or material, and that it would not assist the jury in reaching an informed decision. The court reasoned that Mr. Schacht could not establish a foundation on which to offer an expert opinion because the three sources on which his opinion depended were unreliable and were not the type of sources upon which experts in the field normally relied. These three sources were: (1) Appellant's attorney; (2) an actuary at Mr. Schacht's consulting firm who had informally discussed the matter with Appellant's actuary; and (3) Mr. Schacht's "suspicion" that Appellant's annual statements did not include bulk reserves.
Appellant then called its chief financial officer, David Preimesberger, as both an expert and a fact witness. The trial court excluded Mr. Preimesberger's opinion testimony because he was not timely designated as an expert pursuant to the trial court's order. During Mr. Preimesberger's lay testimony, he acknowledged that he was not personally involved in preparing any cumulative profit calculations. Although Appellant's controller previously answered interrogatories relating to cumulative profit calculations, Appellant did not call the controller as a witness.
The jury returned a verdict in favor of Appellee and awarded damages in the amount of the cumulative profit as determined by Mr. Buttner.

Exclusion of Appellant's Expert Witnesses
In our consideration of the trial court's ruling excluding the testimony of Appellant's expert witness, we apply the well established standard of review that "acceptance or rejection of expert testimony is a matter within the sound discretion of the lower tribunal, and such decision will not be overturned on appeal absent a showing of abuse of discretion." Gray v. Russell Corp., 681 So.2d 310, 316 (Fla. 1st DCA 1996). We find that Appellant has failed to demonstrate reversible error because the trial court did not abuse its discretion and, in fact, correctly excluded Mr. Schacht's testimony.
The trial court's decision to exclude Mr. Schacht's testimony was controlled by section 90.705(2), Florida Statutes (2005), which states:
Prior to the witness giving the opinion, a party against whom the opinion or inference is offered may conduct a voir dire examination of the witness directed to the underlying facts or data for the witness's opinion. If the party establishes prima facie evidence that the expert does not have a sufficient basis for the opinion, the opinions and inferences *470 of the expert are inadmissible unless the party offering the testimony establishes the underlying facts or data.
An expert opinion is inadmissible where it is apparent that the opinion is based on insufficient data. Dempsey v. Shell Oil Co., 589 So.2d 373, 380 (Fla. 4th DCA 1991). See also Centex-Rooney Constr. Co., Inc. v. Martin County, 706 So.2d 20 (Fla. 4th DCA 1997).
The trial court properly exercised its discretion when it excluded Mr. Schacht's testimony based on conversations he had with Appellant's attorney and with an actuary at his consulting firm. Mr. Schacht's opinion, if allowed, would have been based on inadmissible hearsay. The rule is well established that if an expert is called merely as a conduit to place inadmissible evidence before the jury, the trial court appropriately exercises its discretion by excluding such evidence. See Maklakiewicz v. Berton, 652 So.2d 1208, 1209 (Fla. 3d DCA 1995); cf. Linn v. Fossum, 894 So.2d 974, 979 (Fla. 1st DCA 2004) (explaining that a medical doctor's opinion testimony was admissible when it was based partly on inadmissible hearsay and partly on admissible evidence because a medical doctor would normally rely, in part, on conversations with others in forming an opinion).
Additionally, Mr. Schacht's reliance on information provided by Appellant's counsel was not the type of communication "reasonably relied upon by experts in the subject to support the opinion expressed." See § 90.704, Fla. Stat. (2005); Gray, 681 So.2d at 315-16 (stating that the trial court properly excluded expert evidence in its entirety based on expert's failure to rely on sound data in forming his opinion). Mr. Schacht's reliance on informal discussions with the actuary was similarly unreliable because it also was not the type of information normally relied upon by experts.
Excluding Mr. Schacht's testimony based on his "suspicion" that Mr. Buttner's calculations of cumulative profit did not take into account bulk reserves was also an appropriate exercise of the trial court's discretion. An expert's opinion testimony is inadmissible if it is grounded on speculation, conjecture, or incorrect assumptions. See All Am. Pool Surface, Inc. v. Jordan, 870 So.2d 885, 886 (Fla. 3d DCA 2004). Thus, the trial court was eminently correct in its ruling to exclude Mr. Schacht's testimony.
Mr. Schacht's proffered testimony demonstrated that he could not express an opinion on any relevant matter and that he would have confused the jury, rather than assisting it, by inserting additional issues into an already complicated case. Although the Agreement specifically defined "cumulative profit" and the parties agreed that the Agreement was clear and unambiguous, Mr. Schacht attempted to reinterpret the parties' meaning of the term. As the trial court repeatedly noted, whether Appellant made a long-term profit through its acquisition of Caduceus was legally irrelevant; the only dispute at trial was whether Appellant earned a cumulative profit, as defined by the Agreement, from 1999-2002. Whether the Agreement could have been more clearly drafted to protect Appellant's business interest was not relevant, and the trial court correctly excluded Mr. Schacht's attempt to make it relevant. See New York Life Ins. Co. v. Childs, 252 So.2d 288, 290 (Fla. 3d DCA 1971) (finding no error in trial court's exclusion of testimony when the proffer demonstrated that the testimony was neither relevant nor material to the issues involved).
Appellant next argues that the trial court abused its discretion in excluding the expert testimony of Mr. Preimesberger and Mr. Donaldson. We disagree.
*471 Appellant failed to comply with the trial court's order to file within a specific time a complete list of all witnesses, including its designated expert witnesses. While Appellant named Mr. Preimesberger as a fact witness and provided his name as an expert in one interrogatory response, he was never identified as an expert witness and Appellant could not show that it had furnished either a curriculum vitae or a summary of his proposed expert testimony. Therefore, because Appellant's lack of notice deprived Appellee of an adequate opportunity to depose Mr. Preimesberger before trial, the trial court properly excluded his testimony.[1]See Binger v. King Pest Control, 401 So.2d 1310, 1313-14 (Fla.1981).
We decline to consider whether the trial court erred in excluding Mr. Donaldson's testimony. Appellant did not proffer this testimony, and an offer of proof must be made in order to preserve the issue of excluded evidence. See Finney v. State, 660 So.2d 674, 684 (Fla.1995) (explaining that without a proffer, it is impossible for an appellate court to determine whether error occurred, and if so, what effect the error had on trial).

The Denial of Appellant's Motion for Continuance
We find that the trial court did not abuse its discretion in denying Appellant's motion for a continuance. This case had been pending for three and one-half years, and Appellant filed its motion to continue little more than one month before the scheduled date of trial. We believe the trial court's action conformed with the discretionary factors governing the consideration of such motions, as set out in Fleming v. Fleming, 710 So.2d 601, 603 (Fla. 4th DCA 1998).

Conclusion
We hold that the trial court did not abuse its discretion in any of its challenged rulings. AFFIRMED.
WEBSTER and THOMAS, JJ., concur; ERVIN, J., concurring and dissenting with opinion.
ERVIN, J., concurring and dissenting.
I agree with all aspects of the majority's opinion except that affirming the exclusion of Mr. Schacht's expert testimony. Because I am of the firm belief that the lower court's ruling was an abuse of discretion that significantly prejudiced The Doctors Company (TDC) in its defense, I would reverse the judgment entered and remand the case for new trial. Although I acknowledge that Mr. Schacht's opinion could properly be disallowed if it relied solely on information received from TDC's attorney and conversations between his firm's actuary and TDC's actuary, my review of his proffered testimony convinces me that his opinion was independently based on his own analysis, and was far more than simply a suspicion, speculation, or conjecture in concluding that the cumulative profit calculation made by the Department's expert, Edward Buttner, was substantially flawed.
Mr. Schacht's testimony was clearly offered for the purpose of rebutting Mr. Buttner's opinion that TDC owed Caduceus's receiver $14,153,458 for breach-of-contract damages, a figure precisely mirrored *472 by the jury's verdict. TDC attempted to defend the Department's claim through the testimony of its only expert witness by showing that the $14.1 million profit figure Mr. Buttner had estimated, based on his examination of TDC's documents and discovery answers, was excessive, because it failed to take into consideration bulk reserves typically set off against premiums collected by malpractice insurers such as TDC.
Mr. Schacht admitted during his proffered cross-examination that he had earlier stated in his deposition that upon reviewing TDC's 2001 annual statement filed with the Department, he noted more than $27 million in unpaid losses had been reported, leading him to "suspect" that bulk reserves were not included in the statement, and, because of Mr. Buttner's failure to take them into account in reaching his unpaid cumulative profit estimate, his opinion was substantially flawed. Mr. Schacht further explained that after initially determining that reserves had been omitted, he sought confirmation of that opinion from his firm's in-house actuary, who also consulted with an actuary employed by TDC.[2] A careful review of Mr. Schacht's testimony in its entire context reveals he first independently concluded that Mr. Buttner's calculation was incorrect before he asked an opinion from others, and that his own opinion was separately based on his own review of certain documents of TDC that had been admitted into evidence.
In reaching his decision that no profit had been made by TDC during the three-year transitional period provided in the contract, Mr. Schacht focused his attention on pertinent definitions in the Master Agreement and the annual statements reported to the Department during the same span of time. He explained that a correct calculation depended on the premiums collected, and losses and expenses deducted from them in order to ascertain the amount of cumulative profit, defined in the Master Agreement as
[t]he aggregate of Cumulative Net Retained Premium plus Cumulative Estimated Investment Income, less the aggregate of Cumulative Incurred Losses, Cumulative Allocated Loss Adjustment Expense, Death/Disability/Retirement Reserves, and cumulative Operating Expenses payable by TDC.
Mr. Schacht's analysis separately took into account each of the components of the above definition.
Turning to the first item listed, "cumulative retained premium," Mr. Schacht noted that the term is separately defined in the agreement as "the total premium collected by TDC." Although the contract does not explain the means by which a premium is collected, Mr. Schacht explained, observing that Mr. Buttner had equated the definition of premium in the agreement with written premium,[3] that a written premium is understood in the insurance industry as the amount of premiums written for policies during their entire coverage period; however, the amounts of the written premiums reported to the Department in TDC's annual statements did not mean that they had actually been received. He opined that Mr. Buttner's calculation for the receipt of written premiums was inaccurate because it had failed to consider associated losses for the entire policy periods, contrary to principles of statutory accounting *473 requiring a proper matching of income with expenses. This omission, according to Mr. Schacht, accounted for more than $9 million of Mr. Buttner's entire $14.1 million cumulative profit estimate.
In considering the next term in the cumulative profit definition, "cumulative estimated investment income," Mr. Schacht observed that the term was in part defined as "[t]he total amount of interest income projected by TDC to be earned on cumulative net retained premium, based on TDC's actual and projected interest income percentage levels, over a five year horizon from the date of receipt of [the] . . . premium." He explained that because the agreement provided that interest on premiums collected was to be computed over a five-year period, such time span corresponded similarly with the four to five-year term customarily required by malpractice insurers such as TDC to resolve claims filed against its insureds.
Turning to the expenses and losses listed in the definition, Mr. Schacht opined that Mr. Buttner had failed to apply correctly the contractual term "cumulative incurred losses" in reaching his cumulative profit figure. That term, defined as the "the total indemnity amount paid to claimants plus the actuarially determined total indemnity reserve since the effective date,"[4] includes, Mr. Schacht explained, case reserves, i.e., what an adjuster would consider a particular claim to be worth, as well as bulk reserves, what an actuary would estimate to be the ultimate cost to resolve all claims, and, because of the delay involved in resolving such claims, malpractice insurers typically set aside large amounts of reserves, which causes the actual reporting of their payment to be extended beyond the three-year term of the parties' contract, often four to five years, a factor, Mr. Schacht noted, Mr. Buttner's analysis did not take into consideration.
In analyzing the next expense item listed in the definition of cumulative profit, "cumulative allocated loss adjustment expenses [CALAE]," defined as "amounts payable or reserved by TDC directly attributable to specific claims, including but not limited to payments for defense attorneys, medical evaluation of patients, expert medical reviews and witnesses," Mr. Schacht determined from his examination of TDC's 2001 annual statement that two reported items therein, "direct losses unpaid" and "direct defense and cost containment expense unpaid," totaling more than $27 million, led him to believe that Mr. Buttner's calculation of a $14.1 million cumulative profit did not properly include the setting aside of reserves for the payment of CALAE. Such reserves were, in his opinion, contemplated by the parties' definition of CALAE in that they are typically made by medical malpractice insurers to be used for expenses associated with the handling of future claims, including those for the payment of defense attorneys, medical evaluation of patients, and similar costs. Because the payments for CALAE, as they are for cumulative incurred losses, frequently require four to five years, the reservation of funds for such purpose could be expected to continue beyond the December 31, 2001, reporting period of TDC's annual statement and would not be reflected on its reports as a paid expense item.
Mr. Schacht continued that extended reserves are common as well for another designated expense item in the cumulative profit definition, i.e., "death/disability/retirement reserves," defined as a portion of the net retained premium reserved by TDC for the purpose of satisfying future *474 claims beyond the policy period for its insureds at no additional premium due to the death, disability, or retirement of the insured. He explained that such reserves involve coverage extending after the expiration of the policy period, requiring TDC to set aside revenues for the future payment of claims filed against those insureds following their death, disability, or retirement, and, as the other items previously mentioned, he noted they were not expressly listed as unpaid on TDC's annual statements.
To summarize, if Mr. Schacht had been allowed to testify, he would have said that the Department's expert failed to consider bulk reserves in reaching his cumulative profit figure,[5] and that his analysis was flawed because it focused almost entirely on the premium/income side of the cumulative profit definition. He would have also pointed out that medical malpractice coverage requires an insurer to take into account not only the actual payments made to claimants during the policy period, but also an actuarially determined indemnity reserve for future claims that includes bulk reserves. Finally, Mr. Schacht would have concluded from his examination of all of the pertinent information submitted to him that TDC had made no profit during any of the three-year transitional period.
In my judgment, the underlying facts or data provided a sufficient basis for Mr. Schacht's opinion, offered as a means of rebutting the opinion of the Department's expert, because, first, the contractual language itself supplied notice that the parties' agreement contemplated the setting aside of bulk reserves for the resolution of future claims, and, second, an examination of TDC's 2001 annual statement, reflecting a $27 million loss in two reported items, caused by, among other things, "direct defense and cost containment expense unpaid," clearly implied the reservation of monies for such purpose, which Mr. Buttner's evaluation made no attempt whatsoever to take into account.
In excluding Mr. Schacht's testimony, the lower court apparently overlooked the fact that his opinion was primarily grounded on facts or data that had been admitted into evidence: the parties' agreement and TDC's 2001 annual statement. The provisions of section 90.705(2), relating to the procedure for discovering the foundation of an expert's opinion, must be considered in connection with those of section 90.704, describing the type of information reasonably relied on by an expert. Section 90.704 states in part that "[t]he facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial." As such, Mr. Schacht, qualified as an expert in the field of insurance industry transactions, should be considered to have first-hand knowledge of the underlying facts, the documents in evidence, which he personally examined. Cf. Jones v. State, 289 So.2d 725, 727 (Fla. 1974) (qualified expert could express an opinion based on testimony heard by him in court).
*475 Under the circumstances, the record provides no support for the trial court's conclusion that Schacht's expert testimony would be of no assistance to the jury; indeed, it would have aided them in understanding the evidence, particularly the complicated definitions set out in the Master Agreement and their application to the profits and losses reported by TDC.
In addition to excluding TDC's expert because it determined the sources for his opinion were unreliable, the trial court deemed that his opinion lacked an evidentiary foundation as a result of his failure to supply a replacement figure for that given by Mr. Buttner. The burden, however, was not on TDC to establish a dollar amount; it was rather placed on the Department, as the party seeking an award of damages. The failure of the defendant's expert to offer a substitute number hardly meant that his opinion had no foundation. It was the prerogative of the defense to present expert witness testimony for the purpose of deconstructing and rebutting the opinions and calculations of the opposing party's witness. As the Fourth District observed in Griefer v. DiPietro, 708 So.2d 666, 672 (Fla. 4th DCA 1998): "Rebuttal to challenge the calculations of a defense expert is permissible rebuttal evidence." See also Zanoletti v. Norle Props., Corp., 688 So.2d 952 (Fla. 3d DCA 1997) (holding the trial court's exclusion of plaintiff's expert testimony for the purpose of rebutting the calculations of the defense's expert was an abuse of discretion).
In my judgment, any questioned deficiency in Mr. Schacht's expert witness testimony went to the weight of his opinion, not its admissibility. As the Florida Supreme Court observed in Florida Department of Transportation v. Armadillo Partners, Inc., 849 So.2d 279, 287-88 (Fla. 2003): An expert's "opinion may be subject to impeachment or to having its weight reduced because of its failure to properly consider one of the many factors that may influence an opinion . . ., but that failure should not prevent the opinion's admission, nor cause its complete exclusion from the jury's consideration." Accord Dixon v. River City Brewing Co., 904 So.2d 447, 448 (Fla. 1st DCA 2005).
In regard to the Department's argument that TDC should be bound by the admission made by it in its answer to the complaint that the agreements were unambiguous and should be enforced pursuant to their clear terms, it should be observed that notwithstanding the parties' pleadings, both in fact considered parol evidence necessary to explain the contractual definitions. For example, as previously noted in this dissent, although the term "cumulative retained premium" was defined in part as the "total premium collected by TDC," the agreement did not otherwise define the manner in which the premiums were to be collected, which was clearly essential in reaching a determination of cumulative profit. Additionally, during discovery, the Department advised TDC that its expert would testify on the "definition of terms of art within the accounting profession, and the insurance industry accounting terms, contained within the Master Agreement." Finally, the trial court ruled prior to trial that both parties' experts would be allowed to "explain . . . their understanding of . . . what the [contractual] term means to them as an expert." It is obvious from the parties' conduct at trial that any agreement made by them pre-trial as to the contract's lack of ambiguity was generally disregarded by both.
The lower court's error in excluding Mr. Schacht's opinion testimony, moreover, cannot, be deemed harmless. During closing arguments, the Department's attorney repeatedly informed the jury that its expert witness's cumulative profit figure was *476 undisputed and unrebutted, and the jury, as stated, returned a verdict in the exact amount the expert had opined was owed. Indeed, it is well recognized that the exclusion of a party's sole, non-cumulative rebuttal testimony that goes to the heart of the principal defense is an abuse of discretion requiring reversal of the judgment and a remand of the case for a new trial. See Griefer v. DiPietro, 708 So.2d at 672; Dos Santos v. Carlson, 806 So.2d 539, 541 (Fla. 3d DCA 2002). For the reasons stated, I would reverse the judgment entered below and remand the case for new trial.
NOTES
[1] We similarly agree that the trial court properly placed limits on Mr. Preimesberger's testimony as a fact witness due to the fact that he was not employed by Appellant until 2004, after the three-year transitional period referred to in the Agreement. As such, he lacked personal knowledge of many of the matters relevant and material to the issues to be decided by the jury. See § 90.604, Fla. Stat. (2005).
[2] Mr. Buttner also admitted that he had relied on information from other consultants in his firm in forming his opinion.
[3] Mr. Buttner's conclusion was apparently based on TDC's response to the Department's interrogatory admitting that the two terms had the same meaning.
[4] The effective date of the agreement was January 1, 1999.
[5] The omission of bulk reserves in Mr. Buttner's calculations was based on two arguably incorrect assumptions made by him, as was gleaned from Mr. Schacht's proffered testimony and supported by the record: First, Mr. Buttner surmised that because a footnote appeared in TDC's 1999 profit-sharing calculation, advising that bulk reserves had not been considered, the absence of a similar footnote in TDC's 2001 calculation meant that bulk reserves were in fact taken into account, which, as Mr. Schacht would have attempted to explain, they were not. Second, Mr. Buttner assumed that TDC had not set aside such reserves because TDC's answers to the Department's interrogatories never mentioned their existence, although he acknowledged that none of the inquiries specifically asked whether bulk reserves had been included.