983 So.2d 608 (2008)
HEALTH OPTIONS, INC., Appellant,
v.
PALMETTO PATHOLOGY SERVICES, P.A., etc., Appellee.
No. 3D07-1453.
District Court of Appeal of Florida, Third District.
April 16, 2008.
Rehearing and Rehearing Denied June 20, 2008.
*610 McDermott Will & Emery and Steven E. Siff and Michael G. Austin and Justin B. Uhlemann, Miami, for appellant.
Colson Hicks Eidson and Ervin Gonzalez and Patrick Montoya, Coral Gables,; *611 Ross & Girten and Lauri Waldman Ross, Miami, for appellee.
Kirkpatrick & Lockhart and Steven R. Weinstein and Robert C. Leitner, Miami, for The Florida Society of Pathologists, The American Pathology Foundation and The Florida Hospital Association, as amicus curiae.
Steven M. Ziegler and Andres Gonzalez, Hollywood, for The Florida Association of Health Plans, as amicus curiae.
Mateer & Harbert and David L. Evans, Orlando; Sidley Austin and Jack R. Bierig and Richard D. Raskin, for the College of American Pathologists, American Medical Association, and Florida Medical Association, as amicus curiae.
Before WELLS, ROTHENBERG, and SALTER, JJ.
Rehearing and Rehearing En Banc Denied June 20, 2008.
SALTER, J.
Health Options, Inc. ("HOI"), a health maintenance organization ("HMO"), appeals an amended final judgment entered after a directed verdict on liability and jury verdict on damages, each in favor of Palmetto Pathology Services ("PPS"). PPS is a group of pathologists rendering services through their laboratories in area hospitals. We affirm.
I. The Parties and Their Claims
HOI is Blue Cross/Blue Shield of Florida's HMO. HOI provides medical services to commercial, non-Medicare subscribing members in exchange for premium payments. This arrangement is memorialized in a contract between the member and HOI. The contract outlines which services are covered under HOI's plan, and refers to the "applicable state and federal laws and regulations" governing HOI's duties to its members.
HOI's primary duty is to provide coverage for "medically necessary" services and supplies.[1] HOI enters into contracts with hospitals, doctors, and other health care providers in many cases, negotiating stipulated prices and other terms for particular services rendered to HOI's members. In other cases, as here, a specialist or provider may be a "non-participating" or "non-contracted" provider, with the result that the amount of reimbursement payable for services or equipment rendered to an HOI member may be in dispute.
PPS is a group of medical doctors, board-certified pathologists, and their employees. PPS provides professional anatomic and clinical pathology services, including laboratory analysis, to HOI's members in two area hospitals. HOI and PPS had a written agreement regarding the price of those services through 1999, but in that year HOI refused to continue paying for one component of such services.[2] HOI refers to that component as "non-patient specific services," characterizing it essentially as an element of overhead, while PPS refers to these services as the "professional component of clinical pathology" or "PC-CP." We refer to such services by PPS as the "disputed services," *612 because the lawsuit below turns on whether HOI must compensate PPS for them.[3]
The effect of HOI's refusal to pay for this professional component of the total cost of operating the pathology labs (including supervision) is that the amount paid by HOI to the participating hospital for PPS's service is less than the total amount asserted by PPS to comprise a reasonable total charge for the services provided to HOI's members.
HOI maintains that its contract with the hospitals fixes the amount payable by HOI for the in-hospital pathology services rendered to members. HOI argues that the hospitals compensate PPS in accordance with the HOI-hospital contract and by providing PPS an office and other occupancy expenses within the hospital without charge. HOI asserts that it has no statutory, contractual, or common law obligation to pay PPS directly for the disputed services.
The hospitals are not parties to the lawsuit. They have agreed not to directly bill HOI's members, and they receive stipulated payments for the pathology lab work done for the members by PPS's in-hospital laboratories.[4] Again, however, those stipulated payments did not include a component for reimbursement of PPS's disputed services. As a "non-participating provider" of these services, PPS was nonetheless prohibited (by section 641.3154(4), Florida Statutes (2007)) from directly billing HOI's members if PPS knew or should have known that HOI was liable for payment. As to the disputed services, therefore, PPS was not being paid by the hospitals, could not collect from HOI's members, and was not being reimbursed by HOI. PPS commenced its lawsuit below to seek a remedy.
II. Procedural History
PPS sought to recover payment for the disputed services. In its second amended complaint, PPS asserted claims against HOI for declaratory relief, breach of implied contract, quantum meruit, open account, account stated, and breach of third-party beneficiary contract.
HOI removed the case to federal court, alleging that PPS's third-party beneficiary claim was preempted by ERISA[5] and thus a federal question. The federal district court disagreed and remanded the case back to state court. Specifically, the federal court found that HOI could not establish any of the elements required for ERISA preemption. Once the case returned to state court, HOI raised "ERISA preemption" as an affirmative defense.
Prior to trial in the state court, PPS provided HOI with a damages report and summary. This report and summary were compiled from billing records that were in HOI's possession. The report reflected damages in the amount of $1,234,957.55, not including interest. Pre-trial motions in limine were filed pertaining to various *613 aspects of the evidence. Following these motions, PPS removed several charges, and the damage summary was reduced to $1,132,218.70, excluding interest. HOI raises an issue here regarding the timeliness of PPS's revised (and reduced) damage summary.
HOI made two arguments regarding non-payment of PPS for the disputed services. First, HOI asserted that the disputed services were not compensable because they were not rendered by the pathologists to patients face-to-face. Second, HOI claimed it was double-paying for these services since a payment had already been rendered to the hospitals.
PPS responded by arguing that HOI had unilaterally stopped paying for the disputed services as a way to cut costs, but still expected PPS to provide the services. PPS also alleged that HOI never changed its contracts with the hospitals even though HOI negotiated (unsuccessfully) with the hospitals to make them liable to PPS for the disputed services. Additionally, PPS alleged that unlike Medicare, HOI did not increase payment to the hospitals to cover the disputed services.
At the close of PPS's case, HOI moved for directed verdict. Neither HOI's written motion nor its argument asserted that PPS made unauthorized charges to HOI, or that PPS did not follow HOI's approval process. The trial court reserved ruling on HOI's motion.
HOI renewed its motion at the close of the evidence, and PPS also moved for directed verdict. PPS voluntarily withdrew count V, its claim for account stated. The trial court granted PPS's motion for directed verdict as to HOI's liability, and the case proceeded to a jury trial on damages. The jury returned a verdict of $1,132,219, and the trial court entered a 22-page amended final judgment awarding that amount plus prejudgment interest of $414,260.
HOI again moved for directed verdict and new trial. These motions once again did not address HOI's approval process or its argument here that the charges were never authorized. The trial court denied the motions, and this appeal followed. HOI raises two basic issues here: whether the trial court erred in its determination that HOI was liable to PPS as a matter of law, and whether the trial court erroneously admitted evidence that was not produced timely or was "irrelevant, confusing, misleading, and unfairly prejudicial."
III. HOI's Liability
A trial court's rulings on motions for directed verdict, and its interpretation of statutes and contracts, are reviewed de novo. See Found. Health v. Westside EKG Assocs., 944 So.2d 188, 193-94 (Fla. 2006) (statutory interpretation); Jones v. Utica Mut. Ins. Co., 463 So.2d 1153, 1157 (Fla.1985) (contractual interpretation); Contreras v. U.S. Sec. Ins. Co., 927 So.2d 16, 20 (Fla. 4th DCA 2006) (directed verdict).
A motion for directed verdict should be granted where reasonable persons, after reviewing the evidence in the light most favorable to the non-movant, could not reach different conclusions. See Jacobs v. Westgate, 766 So.2d 1175, 1179 (Fla. 3d DCA 2000).
A. Statutory Incorporation
HOI is correct that Florida's "Health Maintenance Organization Act," sections 641.17-.3923, Florida Statutes (2005), does not provide a private statutory right of action for damages stemming from a violation of one of the Act's provisions. See Villazon v. Prudential Health Care Plan, Inc., 843 So.2d 842, 852 (Fla.2003). However, Florida courts have not precluded *614 medical providers from bringing common law claims against an HMO where the claim is based on allegations that the HMO violated provisions of Florida's HMO Act. Found. Health, 944 So.2d at 194; see Villazon, 843 So.2d at 852.
In Foundation Health, the Florida Supreme Court recognized that the medical providers in that case were intended third party beneficiaries of contracts between an HMO and its members. Westside, a group of physicians administering EKG interpretations in addition to other services, claimed that an HMO breached its contracts with members by failing to pay for services rendered by the physicians (who were, as here, non-participating providers). The Court accepted the principle that when parties enter into a contract regarding a matter which is the subject of statutory regulation, those regulatory provisions become a part of the contract. Id. at 195.[6]
HOI argues that the statutes and regulations relied upon by the trial court, even if incorporated within the HOI-member contracts, do not obligate HOI to pay for the disputed services. HOI maintains that subsection 641.3154(2) requires a reversal of the directed verdict. That subsection makes an HMO liable for services rendered to a member "if the provider follows the health maintenance organization's authorization procedures and receives authorization." Because the record does not establish that PPS obtained authorization for the disputed services, HOI argues that it has no liability to PPS. Plainly, however, that provision does not mean that PPS was required to get authorization to send claims to HOI. Rather, the statute requires authorization for the rendition of services to the member. In this case, there is no dispute that primary care physicians gain authorization from the HMO to admit a patient to a hospital. The HOI-hospital contract then authorizes the hospital to render the medically necessary services, including clinical pathology services, to the member.
Additionally, the trial court heard undisputed evidence that HOI never made an issue regarding the authorization of the pathology tests when HOI received claims from PPS. The dispute relates to the amount of money payable for the tests, not authorization or medical necessity.
Subsection 641.3154(1) provides that an HMO is liable for services rendered by a provider to an HMO member whether there is a contract between the HMO and the provider. Similarly subsection 69O-191.049(2)[7] of the Florida Administrative Code requires an HMO to "pay for medically necessary and approved physician care rendered to a non-Medicare subscriber at a contracted hospital which services are covered by the HMO subscriber contract."
HOI next contends that "approved physician care" does not extend to the disputed services when pathologists do not examine a patient or review patient-specific lab work. We disagree. "Physician care," as that term is defined by Florida law, is the "care, provided or supervised by physicians . . . and shall include consultant and referral services by a physician." Fla. Admin. Code R. 69O-191.024(13)(c) (emphasis added). The record here demonstrates *615 that the disputed services include supervisory duties, consultations, and referrals by the physician pathologists.
Historically, subsection 69O-191.049(2) replaced Florida Department of Insurance Bulletin 90-022.[8] The bulletin provided: "HMOs should reimburse ancillary providers for covered professional services rendered directly to the HMO member" (emphasis added). In 1992, what is now Rule 69O-191.049(2) removed and thereby rejected the word "directly." See Don King Prods., Inc. v. Chavez, 717 So.2d 1094, 1095 (Fla. 4th DCA 1998) (finding that a legislature's deletion of a word from a statute is evidence that the word has been rejected). Thus, PPS's medically necessary clinical pathology services "rendered to" (not "rendered directly to") a member are compensable whether or not a pathologist and patient meet directly.
B. Third-Party Beneficiary Status
In order to prevail on its claims, PPS also had to prove that it was an intended third-party beneficiary of the HOI-member contracts. Found. Health, 944 So.2d at 194. The elements of such a claim are: "(1) existence of a contract; (2) the clear or manifest intent of the contracting parties that the contract primarily and directly benefit the third party; (3) breach of the contract by a contracting party; and (4) damages to the third party resulting from the breach." Networkip, LLC v. Spread Enters., Inc., 922 So.2d 355, 358 (Fla. 3d DCA 2006). The trial court correctly concluded that PPS established these elements.
There is no dispute that a contract existed between HOI and its members, and that the contract was intended to directly benefit medical providers rendering services to HOI's members.[9] Likewise, the evidence was undisputed that PPS rendered medically necessary tests and services for which it was not fully paid.
PPS's damages were the same under any of its other alternative common law causes of action. Because we find that PPS established its breach of third-party beneficiary contract as a matter of law, we need not address the sufficiency of PPS's other legal theories of recovery. It is sufficient to say that HOI was liable here, and we affirm the trial court.
C. HOI's ERISA Preemption Claim
HOI argues that PPS's claims are preempted by ERISA. However, there is no cause of action (and thus no preemption) under ERISA for claims by PPS on these facts. Lordmann Enters. v. Equicor, Inc., 32 F.3d 1529, 1534 (11th Cir. 1994). In a detailed thirteen-page order, the United States District Court for the Southern District of Florida rejected HOI's argument. That court refused to accept jurisdiction over PPS's lawsuit when HOI attempted to remove it from the state circuit court. After the federal court remanded the case to the state court, HOI nonetheless reasserted the same argument. The trial court in this case correctly rejected it a second time.
IV. Evidentiary Issues
HOI next argues that the trial court reversibly erred by allowing the admission of "irrelevant, confusing, misleading, and unfairly prejudicial evidence," as well as "an untimely damages summary and voluminous *616 documents not produced in discovery or admitted in evidence."
We assess an alleged abuse of discretion by the trial court in the context of all the evidence. See Jimenez v. Gulf & W. Mfg. Co., 458 So.2d 58, 59 (Fla. 3d DCA 1984). Here, there is substantial competent evidence to sustain the court's directed verdict on liability without the allegedly-excludible evidence. The damages awarded by the jury are simply the sum of the PPS billings for the unpaid disputed services, not the product of a jury affected by passion or prejudice. The trial court's well-reasoned order supports our conclusion that the challenged evidentiary rulings were not "arbitrary, fanciful, or unreasonable." H & H Elec., Inc. v. Lopez, 967 So.2d 345, 348 (Fla. 3d DCA 2007).
Addressing one of HOI's claims in particular, the American Medical Association's Current Procedural Terminology Editorial Panel promulgates terms of art and diagnostic categories that are important in the computer-driven world of medical billing. HOI's testimony and documents established that HOI itself relied on such terms and codes in processing claims, and the expert medical witnesses were permitted to rely on such commercial publications if, in the opinion of the court, the sources of information and method of preparation were such as to justify their admission (information generally used and relied upon by persons in particular occupations). § 90.803(17), Fla. Stat. (2007). The same analysis applies to testimony regarding Medicare's procedure for including an amount for the disputed services. HOI's internal documents admitted into evidence conceded that Medicare accepted the validity of PPS's analysis. HOI's assessment of that fact was part of its own frank realization that denying payment might result in a lawsuit  an admissible admission. HOI is certainly correct that the evidence was prejudicial to its defense, but incorrect that such evidence was irrelevant, confusing, misleading, or unfairly prejudicial.
Finally, we address HOI's contention that PPS should not have been allowed to rely on a revised damage summary and the documents used to produce it. Specifically, HOI contends that PPS did not provide "timely written notice" of an intention to use the revised summary, and that PPS did not make the revised summary available at a "reasonable time and place." § 90.956, Fla. Stat. (2007). Since this summary and the documents underlying it were never unavailable to HOI, and because HOI was not surprised by this evidence, we affirm the trial court on this point.
A trial court may exclude a witness's testimony if the objecting party establishes that it was "surprised in fact" by the undisclosed witness or testimony. Scarlett v. Ouellette, 948 So.2d 859, 862 (Fla. 3d DCA 2007) (citing Binger v. King Pest Control, 401 So.2d 1310 (Fla.1981)). Further, the court must determine whether the objecting party will be prejudiced by the testimony. Id. The court's determination of this prejudicial effect should not focus on the nature of the adverse testimony, but also whether: (1) the objecting party has the opportunity to cure the prejudice or has independent knowledge of the testimony; (2) whether the calling party is acting in bad faith; and, (3) whether the testimony causes a disruption of the trial. Id.
Here, HOI cannot demonstrate that it was surprised in fact by the testimony or that it was prejudiced as a result. The original summary, prior to a revision, was made available to HOI months before trial. HOI can hardly claim now that it was surprised by a revised damage summary *617 that reduced the amount claimed by over $100,000. The underlying documents used in calculating both the original and revised summaries were the billing statements submitted to HOI from a company PPS employed to handle its billing. Indeed, HOI readily admitted that it had in its possession the underlying documents used to prepare the summary years before this case ever came to trial.
Moreover, the trial court gave HOI the opportunity to cure whatever prejudice might have resulted from the testimony. It permitted HOI to depose PPS's damage witness before she testified. PPS also agreed to allow HOI to voir dire the witness outside the presence of the jury. Naturally, HOI had to have, in order to voir dire, depose, and cross-examine the witness, a familiarity with the summary.[10] The main Florida case relied on by HOI to support its contention is Tallahassee Housing Authority v. Florida Unemployment Appeals Commission, 483 So.2d 413 (Fla.1986). Unlike the surprised party in that case, however, the record here reveals that HOI was not "unfamiliar" with PPS's summary. Cf. id. at 414. HOI knew of the summary, and clearly knew of the documents used to produce it, a long time before trial. See Bowmar, 466 So.2d at 345. Finding neither surprise nor prejudice, we find that the trial court did not abuse its discretion when it admitted the revised summary.
V. Conclusion
Finding no error in the amended final judgment and the trial court's denial of HOI's motion for a new trial, we affirm the trial court in all respects.
Affirmed.
NOTES
[1] "Medically necessary" services, according to the member contracts, are those services "required for the identification, treatment, or management of a condition." In order for HOI to cover and pay for a medical service a member receives, the service must be medically necessary.
[2] HOI's own records admitted into evidence at trial demonstrated that HOI (a) sought to save itself $4.1 million annually by discontinuing these payments to clinical pathologists, (b) anticipated that litigation would follow that action, and (c) recognized that Medicare and Medicaid had established payment amounts that included the disputed component for the pathologists' supervision and oversight of the clinical laboratories.
[3] The evidence at trial demonstrated that the disputed services are recognized by the American Medical Association's Current Procedural Terminology Editorial Panel as a discrete component of the work done by hospital clinical pathology laboratories. That group describes the disputed services as nine specific and enumerated categories of activity, including quality control, record keeping, the establishment of protocols and test methodologies, supervision, the assurance of compliance with regulatory requirements, and supervision of technicians and other staff.
[4] Individual medical evaluations of a member's lab results may also be performed by PPS's pathologists. These are billed separately and are not part of the dispute between the parties.
[5] Employee Retirement Income Security Act of 1974. See 29 U.S.C. § 18.
[6] In this case, HOI's member contracts are expressly subject to "all applicable state and federal laws and regulations." The contracts do not exclude either the "prompt pay" provision (section 641.3155) or subsection 641.3154(1), Florida Statutes (2005).
[7] These rules carry with them the force of law. See § 641.36, Fla. Stat. (2007); Fla.Admin.Code R. 69O-191.021.
[8] This new rule replaced the bulletin in 1992. HMOs were on notice that year that they, not their members or hospitals, should be paying for the disputed services.
[9] HOI and the members agreed to provide this benefit so that, for example, medical providers would not directly bill the members for the medical services.
[10] See Bowmar Instrument Corp. v. Fid. Elecs., Ltd., Inc., 466 So.2d 344, 345 (Fla. 3d DCA 1985) (finding that while failing to give written notice of a summary may be a technical violation of section 90.956, Fla. Stat. (1983), the objecting party suffered no harm because the summary and supporting documents were made available far enough in advance for the objecting party to adequately voir dire and cross-examine the testifying witness.)