WETHERELL, J.
Appellee, the plaintiff below, brought a wrongful death suit against the University of Florida Board of Trustees (UFBOT) after her husband, Ronald Pat Stone, died *266 at a UFBOT medical facility. The jury awarded Appellee approximately $2.8 million in damages, and after the trial court denied UFBOT’s post-verdict motions and entered final judgment in accordance with the verdict, UFBOT timely appealed the judgment to this court. UFBOT raises three issues in this appeal: 1) whether the trial court erred in granting Appellee’s motion for directed verdict as to the inapplicability of the heightened standard of proof in section 768.13(2)(b), Florida Statutes (2004), commonly known as the Good Samaritan Act (hereafter “the GSA” or “the Act”); 2) whether the trial court abused its discretion in excluding the medical examiner’s opinion as to the cause of Mr. Stone’s death; and 3) whether the trial court abused its discretion in denying UFBOT’s motion for new trial based on juror misconduct. We conclude that the trial court erred in determining as a matter of law that the GSA did not apply and, accordingly, we reverse the final judgment and remand for a new trial.
On August 6, 2004, around 12:45 p.m., Mr. Stone went to the emergency room at a UFBOT hospital in Starke complaining of severe stomach pain and vomiting. While there, he received intravenous medications to control his symptoms. He also underwent a series of tests that ruled out cardiac problems, as well as a chest x-ray which showed density consistent with a hernia. The physician in charge of Mr. Stone’s care at the Starke facility determined that surgical intervention may be needed, and because a surgeon was not available at the Starke facility, he arranged for a transfer of Mr. Stone to another UFBOT medical facility, Shands at Alachua General Hospital (AGH).
Dr. Hurst, the physician at AGH who would oversee Mr. Stone’s care upon his arrival, suggested that the Starke facility conduct a CT scan before the transport because of possible delays in getting the scan done at AGH. The scan was completed at the Starke facility and the results showed that Mr. Stone’s stomach was inverted and partially in his chest cavity, having pushed through his hiatal hernia. The physicians at the Starke facility did not know the results of the scan before Mr. Stone was transported to AGH, but the radiologist who read the scan indicated in her report that the findings were “worrisome for gastric outlet obstruction,” a condition which is serious and can be life threatening.
Shortly after the CT scan, Mr. Stone was transferred via ambulance to AGH and, upon his arrival at approximately 6:30 p.m., he was admitted to a room on the medical/surgical floor of the hospital. Dr. Wilbur, a resident at AGH, assessed Mr. Stone and ordered a surgical consultation for the next morning. Dr. Wilbur also ordered medication, a nasogastric tube, and directed that Mr. Stone not receive anything by mouth. When Mr. Stone’s blood pressure began dropping, Dr. Wilbur ordered his bed repositioned. Mr. Stone went into cardiac arrest at 11:39 p.m. and was transferred to the intensive care unit where he died the following morning around 9:00 a.m. after arresting a second time.
It was undisputed based on Mr. Stone’s autopsy that his stomach was necrotic; however, there was conflicting evidence as to the mechanism that caused the stomach to die. The experts presented by Appellee testified that Mr. Stone’s stomach died due to lack of blood flow as a result of his hiatal hernia, and that his death was the result of cardiac compressive shock from the pressure the stomach placed on his heart. Appellee’s experts opined that Mr. Stone’s condition was curable had it been diagnosed and treated on an emergent basis by the AGH physicians. By contrast, *267 the experts presented by UFBOT testified that Mr. Stone’s stomach died as a result of a gastric volvulus, or twisting of the stomach, and that his death was a result of shock due to toxins released with the death of the stomach. UFBOT’s experts opined that Mr. Stone’s condition was incurable by the time he arrived at AGH.
UFBOT argued below that the heightened standard of proof in the GSA should apply because, although unbeknownst to the AGH physicians at the time, Mr. Stone was suffering from an emergency medical condition when he arrived at AGH. Appel-lee responded that the Act does not apply because Mr. Stone’s condition was stable when he was transferred to AGH and he was not treated as an emergency patient at AGH until the first cardiac arrest. After the close of the evidence, the trial court ruled that the GSA did not apply as a matter of law and denied UFBOT’s request to present the issue to the jury for resolution.
We review the trial court’s ruling de novo because it involves a question of statutory interpretation and a ruling on a motion for directed verdict. See Health Options, Inc. v. Palmetto Pathology Servs. P.A., 983 So.2d 608, 613 (Fla. 3d DCA 2008) (citing Found. Health v. Westside EKG Assocs., 944 So.2d 188, 193-94 (Fla.2006), and Contreras v. U.S. Sec. Ins. Co., 927 So.2d 16, 20 (Fla. 4th DCA 2006)).
There is surprisingly little case law discussing the GSA. Our research has not located any case interpreting the phrase “emergency services” in the Act, and the parties agree that this issue is one of first impression. Accordingly, we begin our analysis with a brief review of the legislative history of the GSA.
The GSA was enacted in 1965. See Ch. 65-313, Laws of Fla. The Act provided that those who “gratuitously and in good faith” render aid or emergency care at the scene of an emergency outside of a medical facility and without objection of the injured victim could not be held liable for any resulting damages as long as the person was acting as an “ordinary and reasonably prudent man” would have acted under similar circumstances. § 768.13, Fla. Stat. (1965); accord White v. City of Waldo, 659 So.2d 707, 710 (Fla. 1st DCA 1995) (discussing the common law good Samaritan rule). The Act was intended to remove the fear of civil suit or liability that may serve as a deterrent to individuals who would otherwise provide aid to victims of accidents or emergencies. See Ch. 65-313 at 1072, Laws of Fla.
The GSA was substantially amended in 1988 to “promote the availability of emergency medical care by providing immunity from civil liability to hospitals and trauma centers ... rendering care therein to medical emergency care patients.... ” Ch. 88-1, § 45(2), Laws of Fla.; see also id. at § 45(1)(c)2., Laws of Fla. (finding that civil lawsuits brought on behalf of emergency patients often are the result of factors beyond the control of the hospital, including “[t]he fact that the emergency patient may not have had a previously established medical relationship with the defendant, may have been unknown to the defendant, and may have been unconscious or unable to provide essential information, such as medical history, allergies to drugs, and other relevant factors”). The 1988 amendments provided immunity to hospitals and their employees when rendering medical care or treatment “necessitated by a sudden, unexpected situation or occurrence resulting in a serious medical condition demanding immediate medical attention.” Id. at § 46, Laws of Fla. (creating section 768.13(2)(b)1., Florida Statutes). This immunity only applied when the patient entered the hospital through the emergency room or trauma center, and it did not *268 apply after the patient is stabilized and capable of receiving medical treatment as a nonemergency patient. Id. (creating section 768.13(2)(b)2., Florida Statutes). To overcome the immunity provided by the Act, the plaintiff was required to establish that the defendant acted with “reckless disregard” for the consequences to the life or health of another. Id. (creating section 768.18(2)(b)3., Florida Statutes).
The GSA was next substantially amended in 2003. See Ch. 2003-416, § 65 Laws of Fla. The 2003 amendments eliminated the requirement that the patient enter the hospital through the emergency room for the Act to apply and also expanded the medical care subject to the Act to specifically include diagnosis. Id. (amending section 768.13(2)(b)1. and 2., Florida Statutes). The 2003 amendments retained and revised the “reckless disregard” standard that must be shown to overcome the immunity provided by the Act, id. (amending section 768.13(2)(b)3., Florida Statutes), and also retained the language stating that the immunity did not apply after the patient is stabilized and capable of receiving medical treatment as a nonemergency patient. Id. (making only minor grammatical changes to section 768.13(2)(b)2.a., Florida Statutes).
The GSA, as amended in 2003 and in effect at the time of the incident giving rise to this case,[1] provided in pertinent part:
1.Any health care provider, including a hospital licensed under chapter 395, providing emergency services pursuant to obligations imposed by 42 U.S.C. s. 1395dd, s. 395.1041, s. 395.401, or s. 401.45 shall not be held liable for any civil damages as a result of such medical care or treatment unless such damages result from providing, or failing to provide, medical care or treatment under circumstances demonstrating a reckless disregard for the consequences so as to affect the life or health of another.
2. The immunity provided by this paragraph applies to damages as a result of any act or omission of providing medical care or treatment, including diagnosis:
a. Which occurs prior to the time the patient is stabilized and is capable of receiving medical treatment as a non-emergency patient, unless surgery is required as a result of the emergency within a reasonable time after the patient is stabilized, in which case the immunity provided by this paragraph applies to any act or omission of providing medical care or treatment which occurs prior to the stabilization of the patient following the surgery.
b. Which is related to the original medical emergency.
3. For purposes of this paragraph, “reckless disregard” as it applies to a given health care provider rendering emergency medical services shall be such conduct that a health care provider knew or should have known, at the time such services were rendered, created an unreasonable risk of injury so as to affect the life or health of another, and such risk was substantially greater than that which is necessary to make the conduct negligent.
§ 768.13(2)(b), Fla. Stat. (2004).
Although couched in terms of “immunity,” the GSA merely imposes a *269 heightened standard of proof on the plaintiff in cases where the statutory prerequisites are met. The question in this case is whether the trial court correctly ruled that the prerequisites were not met and, thus, the heightened standard of proof did not apply.
As a threshold matter, we reject Appel-lee’s contention that the GSA does not apply in this case because AGH was not providing services to Mr. Stone pursuant to one of the statutes listed in the GSA. The record refutes this tipsy-coachman argument and establishes that AGH was providing services to Mr. Stone pursuant to its obligations under section 395.1041, Florida Statutes.[2] That, however, does not resolve this case because the parties disagree as to whether the services being provided were “emergency services,” as that phrase is used in the GSA.
The GSA does not define “emergency services.” That specific phrase is not defined elsewhere in the Florida Statutes, but the similar phrase “emergency services and care” is broadly defined in section 395.002(10), Florida Statutes (2004), to encompass the medical screening, examination, evaluation, care, treatment, and surgery for an “emergency medical condition,” which, in turn, is defined as a “medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in” serious consequences to the patient’s health or, with respect to a pregnant woman, the health and safety of the fetus. § 395.002(9), Fla. Stat. (2004).
UFBOT argues based on these definitions that, when determining the applicability of the GSA, the focus should be on the existence of the “emergency medical condition” the patient is suffering, whether or not the physician was aware of the emergency nature of the condition at the time. Appellee responds that the definitions of “emergency services and care” and “emergency medical condition” do not apply outside of Chapter 395, Florida Statutes, and that the immunity provided by the Act should extend only to those physicians who act or proceed as if the patient is suffering an emergency medical condition.
We are not persuaded that either of these positions is entirely correct. The subjective standard advocated by Appellee is not workable and goes more to the issue of whether the physician acted with reckless disregard than to the issue of whether the immunity in the GSA applies. Likewise, although the objective standard advocated by UFBOT properly focuses on the patient’s medical condition, it does not take into account when the care was provided.
The plain language of the GSA defines its scope and, therefore, it is unnecessary to look outside the Act for clarification of its terms. Section 768.13(2)(b)2.a. pro *270 vides that immunity under the Act applies to medical care occurring “prior to the time the patient is stabilized and is capable of receiving medical treatment as a non-emergency patient.” This language describes the scope of the immunity provided by section 768.13(2)(b)l., and in doing so, it provides a temporal limitation on the “emergency services” that are subject to immunity.
Construing these provisions in pari materia, we conclude that “emergency services” are those provided for the diagnosis or treatment of an emergency medical condition prior to the time the patient is stabilized and capable of receiving treatment as a nonemergency patient. This interpretation does not hinge solely on the existence of an emergency medical condition, nor does it depend solely on the physicians’ subjective view of the patient’s condition at the time; rather, it takes into account both considerations and, consistent with the plain language of the GSA, focuses on whether the patient’s emergency medical condition was stabilized to the point that it no longer required emergency care. Not only is this interpretation consistent with the language of the Act, but it is also furthers the purpose of the Act because once the patient is stabilized and capable of receiving medical treatment as a non-emergency patient, the rationale underlying the immunity no longer applies.
Accordingly, in this case,[3] the determinative issue is whether, at the time the care was provided to Mr. Stone at AGH, he was stabilized and capable of receiving medical treatment as a nonemer-gency patient. If so, the heightened standard of proof in the GSA does not apply; if not, the Act applies.
In some cases, the applicability of the GSA can be determined as a matter of law, but in others, the applicability of the Act depends on the resolution of factual disputes. Accordingly, the Florida Supreme Court approved two different jury instructions for cases in which the Act is implicated — one for cases “in which either the parties agree that the [Act] applies, or the court, in response to a motion for a directed verdict concludes that, as a matter of law, the [Act] applies,” and another for cases “in which a jury issue exists regarding the applicability of the [Act].” See In re Standard Jury Instructions-Civil Cases-Nos. 95-1 and 95-2, 658 So.2d 97, 98 (Fla.1995) (approving Jury Instructions MI 9.1 and 9.2[4]). We recognize that the supreme *271 court’s approval of these jury instructions for publication does not necessarily reflect a determination by the court that the instructions, or the associated committee notes, are legally correct, but we find it noteworthy that the committee notes for these instructions indicate that, consistent with our plain language interpretation of the Act, neither instruction is to be used “in cases involving patients capable of receiving treatment as nonemergency patients, even if treated in the emergency room.” Id. at 98 (emphasis added); accord In re Standard Jury Instructions In Civil Cases-Report No. 09-01, 35 So.3d at 716.
In this case, there was conflicting evidence as to whether Mr. Stone was medically stabilized after his arrival at AGH. For example, Mr. Stone’s family testified that after he was admitted to AGH he was nonresponsive and in excruciating pain, but the treating physicians at AGH testified that he was stabilized, resting comfortably, and able to carry on a conversation; Mr. Stone was transferred by ambulance from Starke to AGH, but the emergency medical technician in charge of his care during the transport testified that it was a “routine transfer” during which Mr. Stone required no medical intervention; and although all physicians involved at AGH and the Starke facility agreed that Mr. Stone would likely require surgery and his CT scan results revealed a possible life threatening condition, the surgical consultation was not ordered “stat,” but instead was scheduled for the next morning. In light of these, and other, conflicts in the evidence, the question as to whether Mr. Stone was stabilized and capable of receiving medical treatment as a nonemergency patient (and, hence, whether the heightened standard of proof in the GSA applied) was for the jury to decide. Accordingly, the trial court erred in granting Appellee’s motion for directed verdict as to the applicability of the GSA and, thus, a new trial is required.
Based on this disposition, UFBOT’s argument that the trial court erred in denying its motion for new trial based on juror misconduct is moot. Likewise, we need not address the exclusion of the medical examiner’s testimony regarding the cause of Mr. Stone’s death, but we choose to do so in order to provide guidance to the parties and the trial court on remand.
Prior to trial, Appellee filed a motion in limine to exclude the medical examiner’s opinion regarding the cause of Mr. Stone’s death. The motion relied on Linn v. Fossum, 946 So.2d 1032 (Fla.2006), and argued that the medical examiner’s opinion that Mr. Stone died as a result of gastric volvulus should be excluded because the opinion was based entirely on the opinion of another pathologist. The trial court granted the motion, and although the medical examiner’s deposition was read at trial, the portions during which he gave his opinion as to the ultimate cause of Mr. Stone’s death were omitted.
We review this ruling for an abuse of discretion. See Doctors Co. v. Dept. of Ins., 940 So.2d 466, 469 (Fla. 1st DCA 2006).
Linn was a medical malpractice case in which the defense expert testified that she consulted with colleagues to determine that the defendant met the standard of *272 care. The supreme court held that it was error to allow this testimony because it served as a conduit for the admission of hearsay testimony — the opinions of the non-testifying colleagues — that was effectively immune from challenge because the plaintiff was unable to cross-examine the non-testifying experts. Id. at 1038-39; see also Schwarz v. State, 695 So.2d 452, 454-55 (Fla. 4th DCA 1997) (explaining that there was nothing improper about the medical examiner consulting .with other experts in his field, but holding that it was improper to permit him to testify on direct examination that he did so because such testimony creates the impression that the other experts agreed with him and “improperly permits one expert to become a conduit for the opinion of another expert who is not subject to cross-examination”), approved by Linn, 946 So.2d at 1033, 1041.
These concerns are not present in this case because the pathologist whose opinion the medical examiner relied upon in formulating his opinion as to the cause of Mr. Stone’s death testified at trial through his videotaped deposition and UFBOT had a full and fair opportunity to cross-examine him during the deposition. Additionally, the trial court did not simply preclude the medical examiner from testifying on direct examination that his opinion was based on the opinion of another pathologist; rather, the trial court excluded the medical examiner’s opinion altogether. Thus, Linn does not support the trial court’s ruling.
Additionally, although the trial court has considerable discretion in determining whether an expert is qualified to render an opinion, the court should not exclude an expert’s opinion based on matters that go to the weight of the opinion because it is the exclusive province of the jury to weigh the evidence. See Fla. Dept. of Transp. v. Armadillo Partners, Inc., 849 So.2d 279, 288-89 (Fla.2003); Lombard v. Executive Elevator Serv., Inc., 545 So.2d 453, 454-55 (Fla. 3d DCA 1989). Here, it is undisputed that the medical examiner had the requisite qualifications as a pathologist to render opinions regarding cause of death. Indeed, the medical examiner has the statutory duty to determine the cause of death in certain types of cases. See § 406.11, Fla. Stat. (2004). The alleged deficiencies in the medical examiner’s opinion as to Mr. Stone’s cause of death — i.e., that he was unfamiliar with gastric volvulus and that he relied on the opinion of another pathologist to determine that condition as the cause of death— go to the weight of his opinion, not its admissibility. Accordingly, the trial court abused its discretion in excluding the medical examiner’s opinion as to the cause of Mr. Stone’s death.[5]
In sum, because the trial court erred in determining as a matter of law that the GSA does not apply, we reverse the final judgment and remand for a new trial.
REVERSED and REMANDED.
ROBERTS and ROWE, JJ., concur.

. The 2004 version of the GSA applies in this case. The Act was amended in 2004, but that amendment did not impact any of the changes made in 2003 to the provisions of the Act at issue in this case. See Ch. 2004-45, § 1, Laws of Fla. (amending section 768.13(2)(d), Florida Statutes, only).

. Under this statute, general hospitals with emergency departments are required to provide emergency services and care when requested by another hospital seeking a medically necessary transfer of a patient. See § 395.1041(3)(a)2.b., Fla. Stat. (2004). The hospital's obligation to accept medically necessary transfers includes stabilized patients for whom the benefits of the transfer outweigh the increased risks of the transfer. See § 395.1041(3)(c), Fla. Stat. (2004) ("A patient, whether stabilized or not, may be transferred to another hospital which has the requisite service capability ... if ... [a] physician has signed a certification that ... the medical benefits reasonably expected from the provision of appropriate medical treatment at another hospital outweigh the increased risks to the individual's medical condition from effecting the transfer; ... provided that this paragraph shall not be construed to require acceptance of a transfer that is not medically necessary.”) (emphasis added).

. The GSA also provides immunity for “any act or omission of providing medical care or treatment which occurs prior to the stabilization of the patient following surgery” that is required as a result of the emergency and that occurs within a reasonable time after the patient is initially stabilized. § 768.13(2)(b)2.a., Fla. Stat. (2004). We need not determine in this case whether, based on this language, the immunity provided by the Act covers the period after the patient is initially stabilized but before the patient undergoes surgery (in addition to the period during and after stabilization from the surgery) because Mr. Stone did not undergo surgery as a result of the surgical consultation not being scheduled prior to his death.

. These instructions were recently renumbered as 402.16a and 402.16b, respectively. See In re Standard Jury Instructions in Civil Cases-Report No. 09-01, 35 So.3d 666, 716-19 (Fla.2010). The revised instructions no longer include a definition of “emergency circumstances,” which, consistent with our interpretation of the phrase "emergency services,” was defined in the original instructions as:
[Care] [treatment] is rendered under emergency circumstances when a [hospital] [(identify hospital employee providing patient care) ] [physician] renders medical [care] [treatment] required by a sudden unexpected situation or event that resulted in a serious medical condition demanding immediate medical attention, for which (claimant) (decedent) initially entered the *271 hospital through its [emergency room] [trauma center] before (claimant) (decedent) was medically stabilized and capable of receiving [care] [treatment] as a nonemergency patient. In re Standard Jury Instructions-Civil Cases-Nos. 95-1 and 95-2, 658 So.2d 97 at 101 (emphasis added).

. We find no merit in UFBOT’s related contention that the trial court abused its discretion in denying its motion for mistrial after the medical examiner informed defense counsel during trial that he had formed a new opinion as to the cause of Mr. Stone’s death after conducting additional research in preparation for his testimony.